**Affirmed and Opinion filed May 16, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-01058-CV

## IN THE INTEREST OF M.T.R., A CHILD

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-04856J**

## O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. Tex. Fam. Code Ann. § 109.002(a-1). The child is Michael.[1] The appellants are his mother, C.A.R. (Mother), and his maternal grandmother, A.R. (Grandmother), who was an intervenor in the trial court. The trial court terminated Mother's parental rights and appointed the Texas Department of Family and Protective Services (the Department) to be Michael's managing conservator. Mother and Grandmother appealed.

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

Mother raises five issues on appeal. She contends (1) the trial court should have dismissed the suit for want of prosecution, (2) the trial court failed to comply with the Indian Child Welfare Act by not determining Michael's American Indian status, (3) the judgment cannot stand because it is based on legally and factually insufficient evidence, (4) the judgment cannot stand because the Department failed to adhere to its internal "care plans," and (5) Mother had ineffective assistance of counsel. Grandmother raises only one issue; she alleges the judgment cannot stand because it is based on legally and factually insufficient evidence.

First, we hold the trial court did not err by not dismissing the case, because trial was timely under section 263.401(b-1) and (c) of the Texas Family Code. Second, we conclude legally and factually sufficient evidence supports the trial court's findings that Mother endangered Michael and that termination of the parent-child relationship is in Michael's best interest. Third, Mother's assertion regarding the Indian Child Welfare Act is not supported by the record; Michael's American Indian status was denied by Grandmother. Fourth, Mother failed to preserve error with respect to the Department's "care plans," because she did not object in the trial court and did not adequately brief the issue on appeal. Finally, we hold Mother has not shown she received ineffective assistance of counsel.

Grandmother lacks standing to complain of the termination of Mother's parental rights. She has standing to complain only about the trial court's appointment of the Department, rather than her, as Michael's managing conservator. We hold Grandmother has not shown the trial court abused its discretion in its conservatorship decision.

Therefore, we affirm the trial court's decree.

BACKGROUND

## A.    Pretrial removal affidavit

The following facts come from the affidavit of Department caseworker Tinisha Williams.

The Department received a referral in mid-June 2016 alleging neglectful supervision of then-18-month-old Michael. The reporter alleged Mother was in a physical fight with someone at an apartment complex while Michael was nearby in the car. Mother's boyfriend, who was also present, allegedly pointed a gun at the person with whom Mother was fighting. The reporter said Mother smokes marijuana and uses other drugs in front of Michael. Finally, Mother and the boyfriend were both said to be affiliated with separate gangs.

There is no suggestion as to what, if anything, occurred in the six-week period after the referral. The first indication in the record of activity in this investigation is Williams' attempts "throughout the month of August" to find Michael. On September 1, Williams requested law enforcement to conduct a welfare check for Michael. A police officer found Michael in the apartment in which he lived with Mother, Mother's boyfriend, and Grandmother. The officer's initial assessment was that the apartment was clean and Michael appeared healthy. Grandmother said she was the primary caregiver for Michael because Mother was in jail, though she expected Mother to be released soon. Williams arrived at the apartment shortly thereafter. She agreed with the officer that the apartment's physical environment was safe and appropriate for Michael, but she found the apartment "reeked of marijuana."

Williams asked Grandmother to give her the name, social security number, and date of birth for every person 14 years or older who lived in the apartment. Grandmother said she could provide only her personal information. She was unable or unwilling to provide that information with respect to an unidentified male

Williams observed walking in and out of the apartment or her "sons" whom she said visit the apartment frequently. Other than denying he is Michael's father, Mother's boyfriend refused to provide Williams any information. Williams tried to photograph the home but was denied permission by Grandmother.

Grandmother had history with the Department. When her now-adult children were minors, the Department found reason to believe on four occasions that Grandmother neglectfully supervised and/or physically neglected them. Mother had no adult history with the Department, but she had criminal history as well as three pending criminal charges. Mother's boyfriend, later identified as Jason, also had extensive criminal history.

Williams visited Mother in jail the same day. Mother identified three people who might be able to care for Michael during the Department's investigation. Two of the three people were ruled out due to their criminal and/or Department history. The third person said her work schedule prevented her from being able to care for Michael adequately.

Believing Michael to be in immediate danger, the Department filed this lawsuit the next day and requested an order of removal and writ of attachment for Michael. Williams' affidavit was attached to the Department's original petition. The record does not contain a ruling on the Department's request for an order of removal and writ of attachment.

Two weeks later, the trial court conducted a full adversary hearing and signed an order naming the Department as Michael's temporary managing conservator. Six weeks after that, the trial court signed an order approving a family service plan the Department created for Mother and requiring her to comply with that plan and any amended plan.

## B.     The first trial and appeal[2]

Mother executed an unrevoked or irrevocable affidavit of relinquishment of her parental rights as to Michael. Michael's father, A.E. (Father), proceeded to trial. Following a bench trial, the trial court found termination of Mother's and Father's parental rights was in Michael's best interest. The court terminated Mother's parental rights based on her affidavit of relinquishment, terminated Father's rights on other grounds, and named the Department as Michael's permanent managing conservator. Mother and Grandmother appealed; Father did not.

Mother's affidavit of relinquishment designated Grandmother as Michael's sole managing conservator. The trial court found that designation rendered the relinquishment "conditional and not voluntary." Accordingly, in early June 2018, about six weeks after signing the final decree of termination, the trial court granted a new trial for Mother and Grandmother. The termination of Father's rights stood.

Due to the new-trial order, Mother and Grandmother sought voluntary dismissal of their appeal. We dismissed the appeal near the end of August 2018. *See In re M.R.*, No. 14-18-00389-CV, 2018 WL 4037493 (Tex. App.—Houston [14th Dist.] Aug. 23, 2018, no pet.) (mem. op.) (per curiam).

---

[2] Some of the information in this section comes from the record in the first appeal, which was filed in this court. *See In re M.R.*, No. 14-18-00389-CV, 2018 WL 4037493 (Tex. App.—Houston [14th Dist.] Aug. 23, 2018, no pet.) (mem. op.) (per curiam). A court of appeals may take judicial notice of adjudicative facts in its own files that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tex. R. Evid. 201(b), (c); *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 878 S.W.2d 598, 600 (Tex. 1994) (per curiam). We take judicial notice of the materials included in the clerk's record and reporter's record in the first appeal, but only for their existence, not for their truth. *Compare In re C.S.*, 208 S.W.3d 77, 82 (Tex. App.—Fort Worth 2006, pet. denied) ("It is appropriate for a court to take judicial notice of a file in order to show that the documents in the file are a part of the court's files, that they were filed with the court on a certain date, and that they were before the court at the time of the hearing.") *with Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (The court "may not take judicial notice of the truth of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file.").

## C.     The second trial

The second trial was held at the end of October 2018. The testifying witnesses were Mother and Department caseworker Demetrias Byrd. Grandmother represented herself and questioned both witnesses, but she did not testify. The documentary evidence included Williams' removal affidavit, admitted over Mother's hearsay objection; Mother's family service plan and the court order requiring her to comply with it; drug test results for Mother; judgments and orders reflecting Mother's criminal history; permanency reports by the Department; and various orders by the trial court.

### 1.     Evidence about Michael

Michael and Mother lived with Grandmother at the time of removal. Mother said Grandmother and Michael were very close and Grandmother "taught him stuff." Specifically, "he knew a lot of words. He knew how to connect certain things. Like he knew shoes and how to go get his bottle and his cup and she potty trained him and everything."

Following removal, Michael was placed in a foster home, where he remained through the time of the second trial some 26 months later. The foster parent was meeting all of Michael's needs, according to Byrd, and was very bonded with him.

Byrd testified Michael's visits with Grandmother were appropriate after Michael became accustomed to them. Initially, Byrd said, "he would cry, like, hysterically for the first 20, 30 minutes of our visits." Byrd was not sure if Michael was bonded with Grandmother even at the time of the second trial, but she acknowledged he "began to recognize [Grandmother's] face and understood who she was after some time." Michael was "always ready to leave" after visits with Grandmother, according to Byrd. At the end of one visit, Michael said he wanted to go with "Mimi." Grandmother believed she was "Mimi"; Byrd said she believed

6

"Mimi" referred to Michael's foster mother's mother.

Almost four years old at the time of the second trial, Michael knew the alphabet, shapes, and 20 sight words. Byrd agreed Michael had excelled and thrived in the foster home. She elaborated:

> This is his family. This is what he knows. This is the comfort and stability that he has established. At this time, that's all that he knows. So to remove him from the placement and to not terminate and provide permanency for him will be detrimental to his behavior and the progress that he's made while being in care in this home.

Byrd believed termination of Mother's parental rights was in Michael's best interest.

### 2. Evidence about Grandmother

Grandmother was a solid presence in Michael's life until he was removed, according to Mother. Grandmother attended his birth. She went to all his medical appointments. After removal, she consistently communicated to the Department her desire to have him placed with her. She attended every court hearing.

After conducting a home study, the Department concluded Grandmother was not an appropriate caregiver for Michael. Byrd testified the Department was troubled that (1) there were still people living in Grandmother's apartment whom she would not identify, and (2) Grandmother appeared unwilling to keep Mother away from Michael. Further, Grandmother had history with the Department in 2002 and 2010. The details of that history are not included in the record. Byrd testified the Department "validated" the allegations in four or five of the referrals about Grandmother and was unable to complete the investigations in two other referrals. Mother testified she does not remember the Department coming to her house when she was a child. She also said she does not remember Grandmother ever physically disciplining her or her siblings "to an extreme event or at all for that matter."

In closing argument, Grandmother contested the allegation in the removal affidavit that her apartment "reeked of marijuana." She was, according to the trial court, "complaining that nobody drug tested [her]." The trial court asked Grandmother if anything prevented her from submitting to a drug test on her own. Grandmother said she did not know her drug status was important until trial.

Byrd testified Grandmother said she did not want to adopt Michael. But Grandmother suggested in her closing argument that she had not understood the niceties of adoption versus conservatorship at the beginning of the case. She assured the trial court she wants to adopt Michael if Mother's rights are terminated.

### 3. Evidence about Mother

### a. Criminal history

Mother's criminal activity reflected in the record all occurred while she was pregnant with Michael or after he was born. When she was eight months pregnant, she was arrested for criminal mischief resulting in damages between $1,500 and $20,000, a state jail felony. The complaint alleges she struck the complainant's car with her car. At trial, Mother described the incident:

Q. [W]hat did you do then?

A. I had a wreck in my job parking lot.

. . .

Q. There wasn't an incident during that timeframe where you basically rammed this person's car?

A. Well the car was old and I did hit that car. I did, yes.

As part of a plea-bargain agreement with the State, Mother pleaded guilty to a lesser-included class A misdemeanor in May 2015 and was placed on deferred adjudication community supervision for two years.

In January 2016, when Michael was 13 months old, Mother was arrested for robbery with bodily injury, a second-degree felony. She elaborated on that incident at trial as well:

Q.    . . . Says here you're charged with robbery of a Vonda Wilkinson. Who's Vonda Wilkinson?

A.    A worker at Wal-Mart.

Q.    What did you do to her?

A.    We had a fight. She grabbed me and we had a fight. I was stealing from Wal-Mart.

Q.    You were stealing from Wal-Mart?

A.    Yes.

Q.    It says robbery bodily injury. Did you smack her around?

A.    It was a fight, yeah.

Following her guilty plea, in June 2016 Mother once again was placed on deferred adjudication community supervision, this time for five years.

Just one month later, Mother committed another robbery with bodily injury. She testified:

Q.    . . . [Y]ou got charge for a robbery on, looks like Tom O-n-g, who's that?

A.    He worked at a corner store, manager at a store.

Q.    What did you do to him?

A.    I took his phone and broke it.

Q.    Why?

A.    He was saying he was gonna call the police.

Q.    What were you doing to have him call the police?

9

A.    It was a lot of people at his store and he thought that—well he just basically told everybody to move—leave away from the store and I really don't know why I did that. It was stupid.

Mother was arrested and jailed for that robbery in late August 2016. Michael was removed ten days later.

In November 2016, Mother and the State entered into a plea-bargain agreement under which Mother would plead guilty in exchange for a three-year prison sentence. Additionally, the criminal court adjudicated Mother guilty of the previous criminal mischief and robbery with bodily injury and sentenced her to 30 days' and three years' confinement, respectively. All three sentences were to run concurrently. Mother was serving her sentences during both the first and second trials. All told, Mother was in custody for the entire 26-month history of this case.

### b.    Allegations in the removal affidavit

Byrd admitted she had no evidence, other than Williams' statements in the removal affidavit, that (1) Mother was fighting, (2) Michael was nearby, (3) Mother's boyfriend drew a gun, (4) Mother or her boyfriend were gang-affiliated, or (5) Mother used drugs. For her part, Mother offered this account of the allegations in the removal affidavit:

> The altercation, it was not in the apartments as the statement says. It was down the street. It was early in the morning. Me and this girl had been arguing. I went over there to say stuff—we went over there to talk about it. It was a big argument and he never had a gun. My son was never there. And that was basically it. We just argued in her apartment complex.

Mother contended she and "the girl" were yelling but not physically fighting. She said Michael was at home with Grandmother. Her boyfriend was at the scene with her, Mother admitted, but he did not pull out a gun. Mother denied either she or her boyfriend was affiliated with a gang.

10

Mother also denied the drug allegations. She said neither she nor Grandmother smoked marijuana. The only drug test in the record for Mother shows she tested negative. She believes the odor of marijuana Williams allegedly detected may have emanated from a nearby apartment. Byrd acknowledged the officer who went to Grandmother's apartment did not say he smelled marijuana.

### c. Service plan

The Department created a service plan for Mother with the following goals: understand the serious nature of the situation that placed Michael in harm's way; demonstrate the ability to protect Michael from future abuse or neglect and show concern for Michael's future safety; demonstrate an ability to provide basic necessities for Michael, such as food, clothing, shelter, medical care, and supervision; demonstrate acceptance of the responsibility of being a parent; and demonstrate the willingness and ability to protect Michael from harm. To help her achieve those goals, her service plan required her to, among other things: complete a substance abuse assessment and follow all recommendations; participate in a psychosocial evaluation and follow all recommendations; complete in-person parenting classes; refrain from engaging in criminal activities; submit to and test negative on random drug tests; obtain and maintain legal employment and stable housing, both for more than six months; and attend all court hearings, permanency conferences, family visits, and scheduled appointments.

Byrd testified Mother "attempted" to complete a psychological evaluation and parenting classes while incarcerated. Byrd said she mailed release-of-information forms so she could obtain Mother's records but did not receive any records. Mother testified she completed two parenting classes and a psychological evaluation and finished high school while in prison. She said she wants to attend a university when she is released.

### d.      Willingness and ability to parent

Mother testified she wants Michael to "grow up, graduate high school, go to college, be a good human being and do good." She said she will help him pay for college, get a scholarship, and do "whatever it takes" to help him succeed. She said if her parental rights are terminated and Michael is placed with Grandmother, she understands she will not be permitted to live with them. She would go to a halfway house in that situation, she testified. If her rights are terminated but Michael is not placed with Grandmother, Mother said, she intends to live with her.

### 4.      Trial court's findings

The trial court found the Department had proved the requirements of subsections E, N, O, and Q of Family Code section 161.001(b)(1). The court additionally found termination of Mother's parental rights was in Michael's best interest. The trial court appointed the Department to be Michael's managing conservator. Mother and Grandmother timely appealed.

### PROCEEDINGS DURING THIS APPEAL

Mother's appointed counsel, Juliane Crow, filed a brief in January 2019 under *Anders v. California*, 386 U.S. 738 (1967), in which she concluded this appeal is frivolous and without merit. The *Anders* procedures apply to an appeal from the termination of parental rights when an appointed attorney concludes there are no non-frivolous issues to assert on appeal. *In re D.E.S.*, 135 S.W.3d 326, 329 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Grandmother, who was representing herself, did not file a brief.

Six weeks later, attorney Scott Poerschke, then a stranger to this case, filed a "reply brief" to Crow's *Anders* brief. The signature block on the reply brief includes

Poerschke and another lawyer from his firm and describes them as "attorneys for [Mother]."

The trial court conducted a hearing on our order to determine which lawyer would represent Mother. Finding Mother retained Poerschke to represent her on appeal, the trial court allowed Crow to withdraw as counsel. The transcript of that hearing suggested Poerschke also intended to represent Grandmother.

Poerschke filed a brief for Mother and a brief for Grandmother. Those are the briefs on which we have decided this case.

## APPELLATE JURISDICTION

Though she does not raise it as an issue, Mother states in her brief that the November 15, 2018 decree on appeal is not "*truly* final" (emphasis in original) because the trial court did not "enter[] her order below denying the (un-severed) Intervenor-Grandmother's Motion for New Trial" until February 20, 2019.[3] Mother's assertion implicates our jurisdiction. An appellate court must determine whether it has jurisdiction over an appeal, even if it must do so sua sponte. *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004).

---

[3] Mother also suggests the appellate record is not complete because it does not reflect post-judgment proceedings. She writes, "[Mother] urges and here moves that this appeal be stayed, abated, or suspended pending the preparation and transmission of a Supplemental Clerk's Record and any necessary Supplemental Reporter's Record . . . ." Supplementation of the record is governed by rules 34.5(c) and 34.6(d) of the Texas Rules of Appellate Procedure. Further, the following notice has been posted on this court's website since August 26, 2015:

> The proper procedure for a party to supplement the Clerk's Record is by written request to the trial court clerk—no motion or order is needed in the court of appeals. Motions filed in the court of appeals will not be ruled on by the court. If a party needs to rely on a trial court document that is part of the record below, that is not yet part of the clerk's record on appeal, a party should put a copy of the document in the appendix to their brief, with a notation that the official document has been requested from the clerk.

There is no suggestion Mother has requested preparation of a supplemental clerk's record or supplemental reporter's record.

Generally, appeals may be taken only from final judgments. *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). When orders do not dispose of all pending parties and claims, the orders remain interlocutory and unappealable until final judgment is rendered unless a statutory exception applies. *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 352 (Tex. 2001); *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 272 (Tex. 1992) (orig. proceeding). If there has been a full trial on the merits, either to the bench or before a jury, a Mother Hubbard clause— words to the effect of "all relief not granted is denied"—"indicates the court's intention to finally dispose of the entire matter . . . ." *Lehmann*, 39 S.W.3d at 204.

A full bench trial on the merits was held in this case. The decree of termination signed following the trial contains the statement, "IT IS ORDERED AND DECREED that all relief requested in this case and not expressly granted is denied." That statement indicates the trial court's intent to finally dispose of the entire matter. A pending motion for new trial does not render a final judgment not final. *Golden Rod Oil Co. No. 1 v. Golden West Oil Co. No. 1*, 293 S.W. 167, 168 (Tex. Comm'n App. 1927); *Neuhoff Bros., Packers v. Acosta*, 319 S.W.2d 416, 418 (Tex. App.—Dallas 1958), *aff'd*, 327 S.W.2d 434 (Tex. 1959). We conclude the November 15, 2018 decree is final. Therefore, we have jurisdiction over this appeal.

## ANALYSIS

Mother raises two issues that, if sustained, would result in rendition of judgment: whether the trial court should have dismissed the suit, and whether the evidence is legally sufficient to support the judgment. If disposition of an issue would result in a rendition of judgment, we consider that issue before addressing any issues that would result only in remand for a new trial. *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex.2003); *In re S.R.*, 452 S.W.3d 351, 359 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

14

## I.  Dismissal

Mother contends the trial court should have dismissed the suit for "want of prosecution." She appears to argue both that the Department abandoned its suit through delays and that dismissal was mandatory under section 263.401 of the Family Code, the statute that sets the deadline to begin trial in a termination case.

The version of section 263.401 that governs this case[4] states in relevant part:

(a)     Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

Act of May 29, 2015, 84th Leg., R.S., ch. 944, § 38, sec. 263.401, 2015 Tex. Sess. Law Serv. 3268, 3283 (amended 2017; current version at Tex. Fam. Code Ann. § 263.401(a), (b)). In plain English: with certain exceptions, the deadline to begin a termination trial is the Monday after one year after the trial court appointed the Department as the child's temporary managing conservator. A party who seeks to enforce the one-year deadline must file a motion to dismiss before trial begins. Act of May 27, 2007, 80th Leg., R.S., ch. 866, § 3, sec. 263.402(b), 2007 Tex. Sess. Law Serv. 1837, 1838 (amended 2017; current version at Tex. Fam. Code Ann. § 263.402).[5]

---

[4] Section 263.401 was amended effective September 1, 2017. Act of May 28, 2017, 85th Leg., R.S., ch. 319, § 12, sec. 263.401, 2017 Tex. Sess. Law Serv. 716, 721 (codified at Tex. Fam. Code Ann. § 263.401(a)). The amended version applies only to suits filed on or after the effective date. *Id.* § 34, at 735. This suit was filed in September 2016, before the effective date. Therefore, the dismissal deadline in this case is governed by the 2015 version of the statute. *Id.* § 33, at 738.

[5] As with section 263.401, the version of section 263.402 in effect as of the date of this opinion applies only to suits filed on or after September 1, 2017.  Act of May 28, 2017, 85th Leg., R.S., ch. 319, §§ 33, 34, 2017 Tex. Sess. Law Serv. 716, 735, 738.

Grandmother filed a motion to dismiss,[6] but she does not raise the dismissal issue on appeal. Mother raises the dismissal issue on appeal, but she did not file a motion to dismiss or join in Grandmother's motion. As a result, Mother failed to preserve her complaint for appellate review. Our sister courts construing the same version of section 263.402 have reached the same conclusion in three cases. *In re T.W.*, 557 S.W.3d 841, 843–44 (Tex. App.—Amarillo 2018, pet. denied); *In re B.H.R.*, 535 S.W.3d 114, 119–20 (Tex. App.—Texarkana 2017, no pet.); *In re S.L.W.*, 529 S.W.3d 601, 607 (Tex. App.—Texarkana 2017, pet. denied). *See also* Tex. R. App. P. 33.1(a) (before a complaint may be presented for appellate review, record must show complaint was made to trial court by timely request, objection, or motion that sufficiently stated grounds for desired ruling).

Even if Grandmother's motion to dismiss was sufficient to preserve error for Mother, we conclude the trial court was not required to dismiss the case. The one-year deadline in section 263.401(a) does not apply if the court has granted an extension under subsection (b) or (b-1) and if trial begins within the new dismissal date in those subsections. That is what happened in this case.

Subsections (b), (b-1), and (c) state:

(b)     Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a). If the court retains the suit

---

[6] Grandmother orally requested dismissal before testimony began in the second trial. No written motion to dismiss by Grandmother appears in the clerk's record. However, the reporter's record suggests she filed a written motion and distributed copies to all counsel at the time of her oral request.

on the court's docket, the court shall render an order in which the court:

(1) schedules the new date on which the suit will be dismissed if the trial on the merits has not commenced, which date must be not later than the 180th day after the time described by Subsection (a);

(2) makes further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit; and

(3) sets the trial on the merits on a date not later than the date specified under Subdivision (1).

(b-1) If, after commencement of the initial trial on the merits within the time required by Subsection (a) or (b), the court grants a motion for a new trial or mistrial, or the case is remanded to the court by an appellate court following an appeal of the court's final order, the court shall retain the suit on the court's docket and render an order in which the court:

(1) schedules a new date on which the suit will be dismissed if the new trial has not commenced, which must be a date not later than the 180th day after the date on which:

(A) the motion for a new trial or mistrial is granted; or

(B) the appellate court remanded the case;

(2) makes further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit; and

(3) sets the new trial on the merits for a date not later than the date specified under Subdivision (1).

(c) If the court grants an extension under Subsection (b) or (b-1) but does not commence the trial on the merits before the dismissal date, the court shall dismiss the suit. The court may not grant an additional extension that extends the suit beyond the required date for dismissal under Subsection (b) or (b-1), as applicable.

Act of May 29, 2015, 84th Leg., R.S., ch. 944, § 38, sec. 263.401, 2015 Tex. Sess.

17

Law Serv. 3268, 3283–84 (amended 2017; current version at Tex. Fam. Code Ann. § 263.401(b-1), (c)).[7]

We first consider whether the initial trial on the merits commenced "within the time required by Subsection (a) or (b)." Trial began on January 25, 2018. That date was later than September 4, 2017, which was the Monday following the one-year anniversary of September 2, 2016, which was the day the trial court appointed the Department as Michael's temporary managing conservator. The record does not reflect that the trial court signed an order extending the dismissal date due to extraordinary circumstances under subsection (b). Accordingly, it would appear that subsection (b-1) does not apply because the initial trial did not begin timely under subsection (a) or (b).

However, Hurricane Harvey struck the Texas coast on August 25, 2017. Governor Abbott declared Harris County to be in a state of disaster as of August 23, 2017. Tex. Gov. Proclamation No.41-3550, 42 Tex. Reg. 4541 (2017). The Supreme Court of Texas issued an order effective August 28, 2017, entitled "Emergency Order Affecting Child Protection Cases." The order states in relevant part:

> For the protection and care of children for whom the Department is conservator, and pursuant to Section 22.0035(b) of the Texas Government Code,[] in counties in which a disaster is declared, the deadlines and accompanying requirements prescribed in Section 263.401 [of the Texas Family Code] are suspended in a case if the court finds that disastrous conditions resulting from Hurricane Harvey precluded compliance. Any such suspension extends to the date the

---

[7] The Supreme Court of Texas concluded an order granting a new trial did not affect the dismissal deadline in section 263.401, such that the new trial had to be commenced before the original dismissal deadline. *In re Dep't of Family & Protectives Servs.*, 273 S.W.3d 637, 644–45 (Tex. 2009) (orig. proceeding). However, subsection (b-1) did not exist when the supreme court so held. Subsection (b-1) was enacted in 2015. Act of May 29, 2015, 84th Leg., R.S., ch. 944, § 38, sec. 263.401, 2015 Tex. Sess. Law Serv. 3268, 3283 (amended 2017; current version at Tex. Fam. Code Ann. § 263.401(b-1). Where common law is revised by statute, the statute controls. *Bartley v. Guillot*, 990 S.W.2d 481, 485 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

18

court finds it is reasonably possible to proceed, taking into account the circumstances.

Misc. Docket No. 17-9111 ¶¶ 3, 4 (issued Sept. 5, 2017; effective Aug. 28, 2017). *See also* Misc. Docket Nos. 17-9126 (issued Sept. 26, 2017) (extending expiration of Misc. Docket No. 17-9111 to Oct. 25, 2017) and 17-9135 (issued Oct. 24, 2017) (extending expiration of Misc. Docket No. 17-9111 to Nov. 23, 2017).

Just before testimony began in the second trial, counsel for the Department stated the first trial had been delayed due to Hurricane Harvey. Mother's lawyer did not object or challenge that statement. In her brief, Mother cites a September 17, 2017 order in which the trial court retained this case on the docket, and she acknowledges "the Harvey-related docket retention . . . is arguably valid . . . ." Under the circumstances of this case, we conclude the initial trial began timely under subsection (a). Accordingly, subsection (b-1) applies.

We turn next to whether the trial court complied with subsections (b-1) and (c). The trial court granted a new trial on June 7, 2018. On July 31, 2018, the trial court rendered an order in which it (1) scheduled a new dismissal date of December 2, 2018, which is not later than 180 days after June 7, 2018; (2) made further temporary orders for Michael's safety and welfare; and (3) set a new trial date of October 16, 2018. The July 31, 2018 order satisfied the trial court's obligations under subsection (b-1)(1), (2), and (3). The trial court complied with subsection (c) by beginning trial on the merits on October 25, 2018, which was before the new dismissal date of December 2, 2018.

We overrule Mother's first issue.

## II.     Termination

Mother's third issue challenges the legal and factual sufficiency of the evidence to support termination. Though sustaining her factual-sufficiency

challenge would result in remand, not rendition of judgment, we address it with her legal-sufficiency challenge due to the overlapping analysis.

## A. Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether

disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

**B.      Predicate ground for termination: Endangerment**

**1.      Legal standards**

"To endanger" a child means to expose him to loss or injury or to jeopardize his emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *S.R.*, 452 S.W.3d at 360. "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Endangerment contemplates a voluntary, deliberate, and conscious course of conduct by the parent. *S.R.*, 452 S.W.3d at 361. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the conduct need not be directed at a child, nor must the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

21

A parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492.

## 2.    Application

Mother's criminal history is marked by violence. She struck another person's car with her car in a parking lot, apparently intentionally, while she was eight months pregnant. While on community supervision for that offense and knowing any further criminal activity could result in her incarceration, she committed robbery with bodily injury by stealing from Wal-Mart and "smack[ing] around" an employee during the course of the crime. She avoided imprisonment for that robbery and was again placed on community supervision, but less than a month later, she committed a second robbery with bodily injury. The details of that crime are not clear from Mother's testimony. She admitted taking the phone from a store manager and breaking it because "he was gonna call the police." When asked what she was doing that caused him to threaten to call the police, she did not answer the question specifically. Instead she said, "It was a lot of people at his store and he thought that—well he just basically told everybody to move—leave away from the store and I really don't know why I did that. It was stupid." Michael was 13 months old when Mother committed the first robbery and 19 months old when she committed the second.

The public policy of Texas is to "provide a safe, stable, and nonviolent environment for the child[.]" Tex. Fam. Code Ann. § 153.001(a)(2). A parent's

violent criminal history endangers the well-being of a child. *E.g.*, *In re C.A.B.*, 289 S.W.3d 874, 886 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 479–80 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *In re T.G.R.-M.*, 404 S.W.3d 7, 14–15 (Tex. App.—Houston [1st Dist.] 2013, no pet.). This is not a situation where Mother's history of violence ended once she became a parent. To the contrary, she inflicted significant property damage when she was eight months pregnant. Then, knowing any further criminal activity could result in her incarceration, she committed two violent crimes while she had a toddler at home.

As fact finder, the trial court was not limited to considering the mere fact of Mother's criminal history. The court could take into account: (1) Mother's crimes were violent; (2) she committed them all while pregnant or with a toddler at home; (3) she committed two of them while on community supervision for previous crimes; and (4) two of the crimes were second-degree felonies, which carry a punishment range of two to 20 years' imprisonment. Those facts constitute legally and factually sufficient evidence to support the trial court's endangerment finding.

### 3.      Hearsay

On appeal, Mother contends the evidence is legally and factually insufficient because it consisted "almost entirely of hearsay and of hearsay within hearsay, both in the removal/referral affidavit and in live testimony at trial." She complains specifically of the lack of evidence that Mother's boyfriend drew a gun or that the apartment "reeked of marijuana." She also states:

> It defies belief that an alleged — there was never even a scintilla of proof — Crip was dating an alleged Blood. Only Leonard Bernstein could credit that absent compelling evidence; and here there was no evidence, as such, at all.

Mother's argument is unpersuasive for two reasons.

First, Mother did not preserve her hearsay objection. Mother's counsel's objection was: "I'm gonna object to P3, which is the removal affidavit. It's hearsay." The trial court overruled the objection without requesting a response from the Department. The removal affidavit is a six-page document containing several statements by Williams concerning, among other things: (1) the reason for Michael's removal, (2) Mother's and Michael's birthdates, (3) a summary of the Department's investigation, (4) a summary of Michael's family structure, (5) a summary of Mother's and her boyfriend's criminal histories, (6) a summary of Grandmother's history with the Department, (7) a discussion of available relative placements, and (8) the Department's request for temporary managing conservatorship of Michael. Mother's counsel did not specify the portion or portions of the affidavit to which he objected. A hearsay objection that does not identify which parts of a document contain hearsay is not sufficiently specific to preserve error with respect to those parts. *Speier v. Webster College*, 616 S.W.2d 617, 619 (Tex. 1981); *In re L.M.*, No. 14-18-01047-CV, __ S.W.3d __, 2019 WL 1526426, at *5 (Tex. App.—Houston [14th Dist.] Apr. 9, 2019, no pet. h.).

Second, even if Mother had preserved error, reversal is not warranted unless she shows the error amounted to such a denial of her rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See State v. Central Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *L.M.*, 2019 WL 1526426, at *5. "To put it another way, a successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). In making this determination, the court must review the entire record. *L.M.*, 2019 WL 1526426, at *5. The erroneous exclusion or admission of evidence "is likely harmless if the evidence was cumulative, or the

rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Id.* (quoting *A.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00658-CV, 2018 WL 1220894, at *5 (Tex. App.—Austin Mar. 8, 2018, no pet.) (mem. op.)).

As discussed, at trial Mother admitted certain allegations in the removal affidavit and denied others. She admitted fighting but denied Michael was nearby or that her boyfriend drew a gun. She also admitted to her three criminal convictions, even offering her own account of those crimes. When evidence identical or similar to the objected-to evidence is admitted elsewhere without objection, there is no harm. *In re R.H.W.*, 542 S.W.3d 724, 740 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Further, as the sole arbiter when assessing the credibility and demeanor of a witness, the trial court was free to discredit Mother's self-serving testimony. *See H.R.M.*, 209 S.W.3d at 109. In reviewing the entire record, we conclude any error in admitting hearsay statements in the removal affidavit was harmless.

## C.    Best interest

### 1.    Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in their best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the

child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

### 2. Application

***Michael's desires and needs.*** When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). It is undisputed that Michael is extremely bonded with his foster mother and well cared for by her. It is also undisputed that Michael was very close with Grandmother before removal. Though the removal affidavit alleged Grandmother's home "reeked of marijuana" the day before Michael was removed, the affidavit also alleged her home was physically safe and Michael appeared healthy. Byrd testified Michael used to cry hysterically for the first 20 to 30 minutes of his visits with Grandmother. Over time, as he became accustomed to her, he did not appear to be in as much distress

26

during their visits.

***Stability of proposed placement.*** Byrd testified Michael's foster mother is meeting all his needs, and he "excelled" and "thrived" under her care. She expressed no concern about the foster home. Byrd said the Department was still concerned about Grandmother's home as a placement for Michael. In particular, Grandmother still would not identify all the people living in the home, and she appeared unwilling to protect Michael from Mother.

***Endangerment by Mother.*** Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. Accordingly, the evidence of Mother's endangerment of Michael, discussed above, is relevant to the best-interest analysis.

***Service plan.*** Mother testified she completed two parenting classes and her psychological evaluation in prison. Byrd testified Mother "attempted" to complete parenting classes and the psychological evaluation. No evidence suggests Mother would have been able to complete any other requirements of her service plan while incarcerated.

***Mother's willingness and ability to parent.*** Mother stated she will do "whatever it takes" to help Michael succeed in life. She testified she understands her residence when she is released from prison will depend on whether Michael is placed with Grandmother.

***Programs available.*** There is no evidence about specific programs available to assist Mother in parenting Michael.

***Acts or omissions and any excuses for them.*** Mother offered no excuses for her criminal behavior.

## D.     Conclusion

Applying the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding under subsection E of section 161.001(b)(1) that Mother endangered Michael. Accordingly, we do not review the trial court's findings under subsections N, O, or Q. *A.V.*, 113 S.W.3d at 362. We likewise conclude legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in Michael's best interest. We overrule Mother's third issue.

## III.   Indian Child Welfare Act

In her second issue, Mother contends "[t]he case is marred by an abject, persistent, prejudicial, and reversible failure to comply with" the Indian Child Welfare Act (ICWA). *See* 25 U.S.C. §§ 1901–63. Mother did not raise her ICWA objection in the trial court. Under Texas law, her failure to object precludes her complaint on appeal. *See* Tex. R. App. P. 33.1(a). However, this court has held the ICWA preempts state law to the extent there is a conflict. *In re W.D.H.*, 43 S.W.3d 30, 36 (Tex. App.—Houston [14th Dist.] 2001, no pet.).; *accord In re J.J.C.*, 302 S.W.3d 896, 898–99 (Tex. App.—Waco 2009) (mem. op. and abatement order), *disp. on merits*, Nos. 10-09-00269-CV, 10-09-00270-CV, 2010 WL 1380123 (Tex. App.—Waco Apr. 7, 2010, no pet.) (mem. op.). A complaint alleging a failure to follow the ICWA may be raised for the first time on appeal. *J.J.C.*, 302 3 at 899.

"The Indian Child Welfare Act of 1978 . . . was the product of rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642 (2013) (quoting *Mississippi Band of Choctaw Indians v. Holyfield*,

490 U.S. 30, 32 (1989)); *see generally Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 161–62 (Tex. App.—Houston [14th Dist.] 1995, orig. proceeding) (discussing history and purpose of ICWA). When the court knows or has reason to know an Indian child is involved in a child custody proceeding, the ICWA applies to the proceeding. *See* 25 U.S.C. § 1912(a); *W.D.H.*, 43 S.W.3d at 34.

Each of the Department's permanency reports filed in the trial court contains a section regarding the child's Native American status. The Department is supposed to select one of the following options:

> No parent/relative interviewed yet about possible American Indian child status.

> Child's possible American Indian status reported by [parent/relative/other], and is yet to be determined.

> Child's American Indian status denied by [parent/relative/other].

> American Indian status confirmed by [tribe].

Mother cites the permanency report filed July 25, 2018, that indicates no parent or relative had been interviewed yet about Michael's American Indian status. She fails to cite the September 25, 2018 permanency report, which indicates Grandmother had denied Michael's American Indian status. Grandmother's denial rendered the ICWA inapplicable.

We overrule Mother's second issue.

## IV. Department's "care plans"

Mother's fourth issue states, "The court below committed reversible error, or a reversible abuse of discretion, in rendering judgment for [the Department] absent adherence to the [Department's] own care plans." She does not identify the "care plans" to which she refers, nor does she demonstrate that she raised this issue in the trial court. This is the entirety of Mother's argument on this issue:

29

None of the proceedings below has the vaguest relation to the care plans, on which Appellant, in preparing her defense, was entitled to rely. As explained by the Supreme Court in *In re Tex. Dept. of Fam. & Prot. Servs*, 255 S.W.3d 613 (Tex. 2008), the Court must consider protective remedies, including "removing the alleged perpetrators, restraining movement of a child from a specified geographical area, actions that would assist in the investigation[,] and any other appropriate relief under the court's broad authority for the safety and welfare of the child." *Id.*, at 613.

As set out in the Statement of Facts, supra, the record clearly reflects that [the Department] did not adhere to its own Care Plans / Family Service Plans. It did not concern itself with removing the alleged perpetrator, the then-paramour alleged, upon inadmissible hearsay, to have endangered the child; it clearly took no actions and sought no records that would assist in the investigation; it refused even to consider – despite having no ground to dismiss consideration of – a placement with the biological grandmother; and it declined to pursue any less severe a course than to mount an assault upon Appellant's parental rights and seek involuntary termination, despite its having no competent evidence to support the same.

The failure or disinclination of [the Department] to obtain the files showing Appellant's compliance with and completion of, duties imposed upon her by the Family Service Plan below, while incarcerated at TDCJ Lucile Plane State Jail, and the judgment rendered at least in part upon the lack thereof though it was Appellee's duty to obtain these, was reversible error or constituted a reversible abuse of discretion. Absence of proof is no proof of absence. Appellant, as set out in the Statement of Facts, supra, testified to good faith compliance efforts while incarcerated, sufficient to advance an affirmative defense under Texas Family Code Secton [sic] 161.001(d), she bearing the burden of proof to show to the court below by a preponderance of the evidence whether she did, in good faith, attempt to comply with that court's order.

And the court below supinely acquiesced in [the Department's] sloth, in the teeth of the holding in *In re Tex. Dept. of Fam. & Prot. Servs*, supra: thus erring or abusing its discretion, reversibly.

The cited passage from *In re Texas Department of Family and Protective Services*

refers to a trial court's options, not requirements, in making orders for the safety and welfare of the child. 255 S.W.3d at 613. The opinion does not suggest those options constitute "care plans" by the Department.

To preserve a complaint for appellate review, the party must sufficiently raise the issue in the trial court. *See* Tex. R. App. P. 33.1(a). Further, every issue presented by a party must be supported by argument and authorities in the party's brief on the merits, or it is waived. *Gunn v. McCoy*, 554 S.W.3d 645, 677 (Tex. 2018); *see* Tex. R. App. P. 38.1(i). Mother neither preserved error regarding any "care plans" nor briefed the issue adequately. We overrule Mother's fourth issue.

## V. Ineffective assistance of counsel

In her fifth issue, Mother argues she was denied effective assistance by her trial counsel and her first appellate counsel.

### A. Legal standards

Parents who cannot afford to retain counsel in Texas parental-termination cases enjoy a right to appointed, effective counsel. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). We apply the established *Strickland* test in parental-termination proceedings. *Id.* at 545 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). *Strickland* imposes a two-pronged standard to establish an ineffective-assistance claim. First, the parent must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the parent must show that the deficient performance prejudiced the case. This requires showing that counsel's errors were so serious as to deprive the party of a fair trial—a trial whose result is reliable. *Strickland*, 466 U.S. at 687. In other words, a parent must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the parent's case. *M.S.*, 115 S.W.3d at 545.

To determine whether representation was deficient, we must consider all of the circumstances surrounding the case and determine whether counsel was "reasonably effective." *Id.* In doing so, we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). Only if counsel's conduct is "so outrageous that no competent attorney would have engaged in it" will we find such performance deficient. *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *M.S.*, 115 S.W.3d at 550. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, the parent must also show that "counsel's deficient performance prejudiced the defense." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *Strickland*, 466 U.S. at 687).

An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *L.G.R.*, 498 S.W.3d at 209. We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions. *In re Z.M.R.*, No. 14-18-00461-CV, 2018 WL 5660725, at *8–9 (Tex. App.—Houston [14th Dist.] Nov. 1, 2018, no pet. h.) (mem. op.). Mother bears the burden of demonstrating a reasonable probability her parental rights would not have been terminated if not for her trial counsel's conduct. *See In re V.V.*, 349 S.W.3d 548, 559–60 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

**B.      Application**

In her brief, Mother identifies three categories of ways in which her trial counsel was deficient: (1) failure to object to hearsay (she says he "failed adequately to object to the admission of Exhibits P3, P5, P8, and P11 over hearsay objections" and "failed consistently and effectively to object to [the Department's] entirely conclusory and hearsay-ridden testimony"), (2) inadequate development of evidence regarding Mother's service plan (she cites his failure to object to the Department's "anticipatory defense" that Mother could not complete her family service plan because she was in prison and his failure to obtain prison records relevant to Mother's completion of the service plan), and (3) errors in trial strategy (she complains he failed "affirmatively to prosecute [Mother's] defense and affirmative defenses" and "to obtain the testimony of a trial witness of [Mother's boyfriend]"). She also asserts she received ineffective assistance of counsel on appeal, because her former appellate lawyer filed a "frivolous appeal brief where there are nonfrivolous issues."

*Hearsay objections.* Mother first suggests her trial lawyer had a duty to both object to the admission of evidence and then, after the trial court overruled the objection, object again. She cites no authority to support that contention. In any event, when Byrd testified about the referral affidavit, Mother's trial lawyer objected again that the underlying allegations were hearsay. Second, as discussed at length above, any error the trial court committed in admitting hearsay evidence was harmless, so any failure to object to such hearsay could not have prejudiced Mother.

*Service plan.* Mother faults her trial lawyer both for (1) not objecting to the Department's "anticipatory defense" that Mother was not able to complete her service plan because she was in prison, and (2) not developing the affirmative defense, now codified in section 161.001(d) of the Family Code, that she was unable

33

to complete her family service plan because she was in prison.[8] She does not explain how her lawyer could be at fault in both respects simultaneously.

*Trial strategy.* Mother does not identify what defense and affirmative defenses her lawyer should have developed. We must indulge in the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *M.S.*, 115 S.W.3d at 549. That presumption also insulates Mother's trial lawyer's decision not to call Mother's boyfriend, who had a long criminal history, to testify.

*Appellate counsel.* Any harm to Mother caused by Juliane Crow's filing of an *Anders* brief was cured when Scott Poerschke became counsel for Mother and filed a brief on her behalf.

## C.     Conclusion

Mother has not shown that (1) her trial counsel's performance was deficient, or (2) the deficient performance prejudiced her case. *M.S.*, 115 S.W.3d at 545. We overrule Mother's fifth issue.

## VI.     Conservatorship

In her sole issue, Grandmother contends the judgment cannot stand because it is based on legally and factually insufficient evidence. An appealing party may not complain of errors that do not injuriously affect her or that merely affect the rights

---

[8] Section 161.001(d) applies only to suits filed on or after its effective date of September 1, 2017. Act of May 26, 2017, 85th Leg., R.S., ch. 317 §§ 73(c), 79, 2017 Tex. Sess. Law Serv. 615, 618, 640–41 (to be codified at Tex. Fam. Code § 161.001(b)(1)(d)). The Department filed its original petition for termination in September 2016. Accordingly, the 161.001(d) defense to subsection O does not apply to this case. *In re S.J.N.*, No. 14-18-00529-CV, 2018 WL 6494256, at *5 (Tex. App.—Houston [14th Dist.] Dec. 11, 2018, pet. denied) (mem. op.) (op. on reh'g) (concluding 161.001(d) defense did not apply to suit filed in June 2017); *In re A.W.*, No. 02-18-00147-CV, 2018 WL 5074770, at *10 (Tex. App.—Fort Worth Oct. 18, 2018, no pet. h.) (mem. op.) (concluding section 161.001(d) defense did not apply to suit filed in October 2016).

of others. *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 150 (Tex. 1982); *Breaux v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-03-00392-CV, 2004 WL 1171691, at *1 (Tex. App.—Austin May 27, 2004, pet. denied). Accordingly, Grandmother lacks standing to challenge the termination of Mother's parental rights. *See Breaux*, 2004 WL 1171691, at *1 ("[I]t is doubtful that [the grandmother] has standing to complain of the termination of [the mother's] parental rights."). Based on her assertion in her brief that "[e]vidence as to Grandmother's suitability as a conservator . . . was legally and factually insufficient to support the judgment rendered," we interpret her issue as a challenge to the trial court's decision to appoint the Department, rather than her, as Michael's permanent managing conservator.

The Texas Family Code creates a rebuttable presumption that a parent will be named a child's managing conservator unless the court finds that such appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code Ann. § 153.131(a). If the trial court terminates the parent-child relationship with respect to both parents or to the only living parent, "the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a).

Termination of parental rights and appointment of a non-parent as sole managing conservator are two distinct issues, requiring different elements, different standards of proof, and different standards of review. *Compare* Tex. Fam. Code Ann. § 161.001 *with* Tex. Fam. Code Ann. § 153.131(a); *see also In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007). Additionally, "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship[.]" Tex. Fam. Code Ann. § 153.002.

Unlike the standard of proof for termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need be established by a mere preponderance of the evidence. *See* Tex. Fam. Code Ann. § 105.005; *J.A.J.*, 243 S.W.3d at 616. Likewise, the standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for termination of parental rights. *J.A.J.*, 243 S.W.3d at 616. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion only. *Id.* We may not reverse the trial court's appointment of a non-parent as sole managing conservator unless we determine the appointment is arbitrary or unreasonable. *Id.*

Because both parents' rights had been terminated, the trial court was required under section 161.207 of the Family Code to appoint a "suitable, competent adult," the Department, or another permissible agency as Michael's managing conservator. *See In re C.N.S.*, No. 14-14-00301-CV, 2014 WL 3887722, at *13 (Tex. App.— Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.). The appointment may be considered a "consequence of the termination." *L.G.R.*, 498 S.W.3d at 207.

Like Mother, Grandmother suggests the trial court improperly based its conservatorship decision on flimsy evidence: hearsay allegations in the removal affidavit, testimony regarding her own Department history but no documentary evidence of that history, and disputed evidence about the nature of her and Michael's visits. She writes:

> The standard for review in these cases being akin to that in criminal appeals, it hardly wants pointing out that this evidence is akin to trying someone, impermissibly, "for some collateral crime or for being a criminal generally" – with the added fillip that here, all that is advanced is rumor and suspicion never resulting in an adjudication of unfitness.

We first note Grandmother's argument is premised on an incorrect burden of

proof and standard of review. As stated above, the burden of proof for conservatorship is preponderance of the evidence, not beyond a reasonable doubt, and the standard of review is abuse of discretion, not evidentiary sufficiency.

Further, even ignoring the allegation that Grandmother's apartment "reeked or marijuana," there is other evidence on which the trial court could have based its conservatorship decision. Grandmother did not deny her Department history at trial, nor did she object to the lack of documentary evidence of that history. She has not preserved error in that regard. *See* Tex. R. App. P. 33.1(a). She did not challenge Byrd's testimony regarding people living in Grandmother's apartment whom Grandmother refused to identify. We must defer to the fact finder's implicit assessment of credibility and demeanor of witnesses as well as its resolution of factual disputes. *See L.M.I.*, 119 S.W.3d at 712.

Because Grandmother has not shown the trial court's decision was arbitrary or unreasonable, we find the trial court did not abuse its discretion in appointing the Department, rather than her, as Michael's managing conservator. We overrule Grandmother's sole issue.

## CONCLUSION

We affirm the trial court's final decree.

/s/    Ken Wise
Justice

Panel consists of Justices Wise, Jewell, and Hassan.