# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00326-CV

---

### R. P. and M. J., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 308924, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

R.P. (Mother) and M.J. (Father) appeal from the trial court's decree of termination following a bench trial.[1]  The trial court terminated their parental rights to their four children and appointed the Texas Department of Family and Protective Services as the children's managing conservator.  In five issues, Mother and Father challenge the admission of the removal affidavits and the legal and factual sufficiency of the evidence to support the predicate ground findings, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O); that termination of their parental rights was in their children's best interest, *see id.* §161.001(b)(2); and that appointment of the Department as managing conservator was in the children's best interest.  For the following reasons, we affirm the trial court's decree of termination.

---

[1]  We refer to appellants by their initials or respectively as Mother and Father.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  We refer to the children from oldest to youngest as Child 1, Child 2, Child 3, and Child 4.

## BACKGROUND

In April 2019, the Department filed an original petition in a suit affecting the parent-child relationship and sought termination of appellants' parental rights to, and managing conservatorship of, two-year-old Child 1, one-year-old Child 2, and infant Child 3. In the supporting affidavit, the Department's investigator averred about intake reports alleging "severe physical neglect" based on the appearance of Mother, Child 1, and Child 2; concerns about Mother's lack of "general hygiene practices" when she was at the hospital giving birth to Child 3; and the unsanitary living condition of the family's residence, in which its floors were covered with large piles of trash, clothes, and food and one of its rooms had pieces of lumber and a saw that were accessible to the children. The children were removed, and the Department was appointed the children's temporary managing conservator.

In August 2019, the parties entered into a Rule 11 agreement. Pursuant to the agreement, the Department was dismissed as the children's temporary managing conservator, Mother and Father were ordered to participate in family-based safety services, the children were returned to Mother and Father on a monitored return, and the Department agreed to provide daycare.

In September 2019, the Department filed a new petition seeking to terminate parental rights and to be appointed managing conservator of the children based on appellants' noncompliance with the monitored return and lack of cooperation with the Department. In the supporting affidavit, the Department's representative averred that the Department had received an intake report that the family was not responding to requests for Department personnel to visit their residence and was "evading meeting with [the] Department." Concerning his investigation, the representative averred that: (i) daycare staff advised that the children had not been present

2

for several days; that when present, they were "often dirty," "have scratches and bruises," and a "strong odor as well"; and that Mother was "usually unkempt" and had a "strong odor" when she brought the children to daycare; (ii) the representative unsuccessfully attempted to meet the family at their residence and observed "debris and trash all over" their front yard; (iii) he later made contact with the family at a store and observed the concerning condition of the children[2]; and (iv) Mother and Father were "extremely hostile from the beginning and refused to cooperate with [him] concerning viewing their residence, or explaining why they had not complied with court ordered services."  The trial court signed an order for protection of the children in an emergency, and the children were removed and placed in foster care.

In April 2020, Mother prematurely gave birth to Child 4, and the Department filed an amended petition that included all four children and sought to remove and place Child 4 in foster care.  In the supporting affidavit, the Department's investigator averred about multiple additional intakes that the Department had received, including "neglectful supervision" based on concerns that Mother and Father were homeless and living in their vehicle "with no air" and "filled with garbage" and that Mother forced discharge from the hospital with Child 4 against medical advice.  The investigator observed Child 4 in appellants' vehicle when the weather was "very hot," the vehicle was "filled from floor to ceiling with garbage and other items," and Child 4's "space" "was very small and was surrounded by items that could have easily fallen on the

---

[2] Concerning the children's condition, the investigator averred that they were "extremely dirty with caked dirt on their feet, arms, and faces"; none of the children were wearing shoes; and one of the children was "skinny, with a distended stomach," had "a ring of black, crusted residue on her neck," and "was drinking from a milk bottle that had clumps inside of it and appeared old."

baby while [the] vehicle [was] moving."[3]  The trial court entered further orders, removing Child 4, placing her in foster care, and extending the dismissal date and the court-ordered services.

During the pendency of the case, Mother and Father participated in court-ordered services.  They maintained contact with the Department, completed psychological and psychiatric evaluations, participated in weekly supervised visits with their children, and attended court hearings.[4]  They both were employed, working six days a week, and continued to participate in therapy.  On their weekly day off from work, they attended sessions with their therapist and supervised visits with their children at the Department's office.  Concerning their residence during the pendency of the case, they stayed with a friend in a camper and Mother's sister, and in the early part of 2021, they began living in a trailer on family property.  They also acquired a new vehicle prior to the bench trial.

The bench trial occurred over two days, February 25 and April 29, 2021.  The Department sought to terminate parental rights and for the children to stay in their current placements.  Approximately a month before trial, the Department had placed Child 1 and Child 2 in one placement and Child 3 and Child 4 in a separate one.

On the trial's first day, the trial court took judicial notice of its entire file, and the Department's witness was appellants' current counselor who began seeing them in May 2020 after they were unsuccessfully discharged from two prior counseling places.  He testified that he counseled them on how to properly care for children but that they did "not really" acknowledge

---

[3]  The investigator averred that the "vehicle had excessive garbage throughout," the temperature was 97 degrees, "the baby was in the [vehicle] with only one door open," "[t]he baby was filthy and had on soiled clothing," and "[t]here was a foul odor on the baby and the baby was very red from the heat."

[4]  Mother and Father were not asked to drug test.

4

the condition that the children were in when they came into care or that their living conditions were not appropriate for the children. He also did not think "they ever fully grasped in counseling what [he] was trying to explain to them about the need of little children who crawl on the floor, and so forth, to have a clean home." He, however, testified that he had not noticed hygiene issues when the sessions with Mother and Father were in person and testified that they both had cognitive skills. He testified that if the Department's only concern was their living conditions, it made "sense" to give them "a little more time to see if they're going to maintain the trailer." He explained, "if the case were extended and they were able to keep the house clean, then we would know that there was some good work done; otherwise, [he didn't] think we have any proof that they have come to grips with this problem."

When the trial resumed two months later, the trial court admitted the Department's September 2019 and May 2020 supporting affidavits as exhibits over appellants' hearsay objections and, without objection, the family service plan. The Department's stated concerns in the family service plan included: (i) Mother and Father's "physical living conditions of the home [that] were deplorable" and posed a safety risk to the children's health and well-being; (ii) the long-term exposure to unsanitary conditions that may be causing detrimental effects to the children's health; and (iii) Mother and Father's struggle to understand health and safety risks to children associated with unsanitary physical living conditions.

The Department's witness on the final day of trial was its conservatorship caseworker who had been assigned to the case from its beginning. She testified that the Department became involved with the three older children because of "[n]eglect and deplorable, unsanitary living conditions" and the children's "failure to thrive" and not "meeting their educational growth charts." There was "[t]rash in the home, unclean kitchen living conditions,

5

roaches in the home, things of that nature," and the children were dirty and "unkempt." Concerning the attempted monitored return and subsequent removal of the three oldest children, the caseworker explained that after they were initially removed, Mother and Father moved locations to another home, and the children were returned to them on a monitored return; and that, at the beginning, the new home was in good condition, and the children "were doing well"; but that after a month with family based services, "the home returned to the same unsanitary, deplorable conditions," and the children were removed again.

Concerning the removal of Child 4, the caseworker testified about the intakes from the hospital where Mother gave birth to Child 4 and the observed condition of appellants' vehicle with Child 4 in it. She explained that Mother had left the hospital against medical advice; the hospital's stated concerns included that Child 4 had "some smoke inhalation"; appellants' vehicle was observed to be "full of trash, trash coming out of the vehicle, trash stacked up to the back of the windows of the vehicle, and [Child 4] was in a dirty type car seat"; and there was concern that Mother was living in the vehicle at the time.

The caseworker also testified about her observations of appellants' vehicle starting in October 2020 when Mother and Father would come for visits with their children at the Department's office. She testified that it had remained in the same "trashed" condition with "[j]ust trash everywhere" and that after she spoke to them about it, Mother and Father began to park it in locations where she would have to look for it. She explained that their visits with their children were not concerning—they "would come, provide food for the kids, have normal visits during the week"—but that the visits remained supervised because of their vehicle's condition. When she spoke to Mother and Father about her concerns with their vehicle's condition, they told her that "it wasn't dirty" and did not agree with her. Photographs of the vehicle that were

6

admitted into evidence and taken in October, November, and December 2020 and January 2021 when the vehicle was parked at the Department's office show its interior full of trash and its license plate number.

The caseworker also testified about her observations of the condition of Mother and Father's home. She observed the trailer twice, once in January 2021 and once a few days before the final day of trial. She testified that Mother was aware that the caseworker was on her way but that the caseworker did not see the trailer's interior because Mother and Father were not there when she was there and that there was "trash everywhere in the yard," "like an old camper, an old wheelchair, trash bags, an old car that was full of trash and cans," and "the grass was high and uncut." When she later asked Mother and Father about the yard's condition, they told her that "some people had broke in and vandalized the property and they were trying to clean it up." Photographs of the exterior of the trailer and yard that were taken in January 2021 were admitted as exhibits. When the caseworker observed the trailer in April 2021, she testified that the outside "still looked the same," except there was "an industrialized-type trash container outside," but the interior "was clean" and "look[ed] livable" with running water and electricity. She, however, was concerned that there was "plywood [on the floors] throughout the home" with four young children, that there was a hole in the wall in one bedroom for one of the children and no hot water in the bathroom for the children, and that the children would not be able to play outside. She testified that she had not seen Mother and Father "consistently over a month being able to live in a clean home" and expressed her concern that they would "end up back in the same conditions, especially based on what the outside of that home looked like."

As to the children being placed in two separate homes, the caseworker testified that the children had "transitioned very well in these placements," that both were long-term

whether Mother and Father's rights were terminated or not, and that the placements were in contact with each other and willing to participate in sibling visits.

Mother and Father testified on their own behalf. Mother testified that they bought the trailer in September, moved it on the property in December, and officially began living in it at the end of January or beginning of February. She testified that the home had been clean since they moved in; that as to the outside, they were "working on cleaning it up" and that is why they had the large dumpster in their yard; and that the home was ready for the children "to be back." If the children were returned, Mother testified that they would attend daycare, that the oldest might go to school, and that she would change her work schedule so she could be there when the children were not in school or daycare. She answered affirmatively when asked if she understood the concerns about the cleanliness and unsanitary nature of their home and vehicle and acknowledged that the vehicle "does get a little dirty" but testified that they keep the home clean and that she did not think the photographs of a vehicle's interior were of their vehicle. She also expressed concern that the children were in separate placements and testified that they were "very bonded and very close."

In his testimony, Father also expressed concern about the children being in separate homes and additional concerns from their visits, such as observing a "few bruises," scratches, and rashes on the children and fear shown by one of the children to be "around any male." He testified to his belief that their home was ready for the children. He testified that it was clean with working hot water, electricity, and internet service; that its condition was normally like it was when the caseworker saw it in April 2021; that he vacuumed daily and sanitized once a week; and that he understood why it was important to keep the children "clean and safe in the home environment." He also denied that photographs showing a vehicle's

8

interior were of their vehicle and testified that their vehicle was cleaned up in November 2020 and that he was "doing everything" possible to change his work hours so that he would be able to spend more time with his children if they were returned.

The guardian ad litem agreed with the Department's position to terminate parental rights, stating that he did not "think these parents get it even though they are intelligent enough" and that "we're here at the exact same spot of our first removal." Following closing arguments, the trial court ruled in the Department's favor and thereafter signed the decree of termination. This appeal followed.

## ANALYSIS

### Admission of Affidavits

In their first issue, Mother and Father argue that the admission of the Department's September 2019 and May 2020 affidavits that supported the children's removal as evidence in a termination proceeding without an exception to the hearsay rules was an abuse of discretion and violated due process.

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *A.B. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00658-CV, 2018 Tex. App. LEXIS 1790, at *7 (Tex. App.—Austin Mar. 9, 2018, no pet.) (mem. op.) (quoting *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005)). "A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner 'without reference to any guiding rules or principles.'" *Id.* (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

9

At trial, Mother and Father objected to the admission of the affidavits on hearsay grounds but without providing argument in support of their objections. *See* Tex. R. Evid. 801(d) (defining "hearsay" as statement offered to prove truth of matter asserted). In the context of section 161.001(b)(1)(O), however, affidavits are admissible to prove that the children were removed for abuse or neglect. *F.C. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00625-CV, 2020 Tex. App. LEXIS 119, at *18–19 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.); *see* Tex. Fam. Code § 161.001(b)(1)(O) (requiring proof that child was removed from parent under chapter 262 for abuse or neglect to show that parent failed to comply with court-ordered services); *In re E.C.R.*, 402 S.W.3d 239, 248–49 (Tex. 2013) (considering affidavit, "even if not admissible for all purposes," as evidence in support of removal for abuse or neglect under chapter 262 of Family Code). Because the Department sought termination under subsection (O), the trial court reasonably could have admitted the affidavits for the limited purpose of proving that the children were removed for abuse or neglect. Thus, we cannot conclude that the trial court abused its discretion in overruling appellants' hearsay objections and admitting the affidavits. *See A.B.*, 2018 Tex. App. LEXIS 1790, at *7; *F.C.*, 2020 Tex. App. LEXIS 119, at *18–19.

Moreover, even if we were to assume without deciding that the trial court abused its discretion in admitting the affidavits, we cannot conclude that Mother and Father have shown that the affidavits' admission was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a); *In re M.T.R.*, 579 S.W.3d 548, 569–70 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (explaining that even if hearsay objection was preserved, appellant did not show that error amounted to denial of rights as was reasonably calculated to cause and probably did cause rendition of improper judgment); *A.B.*,

10

2018 Tex. App. LEXIS 1790, at *11 (same).  In making this determination, we review the entire record, *see In re M.T.R.*, 579 S.W.3d at 569; *A.B.*, 2018 Tex. App. LEXIS 1790, at *11, and when the evidence is cumulative of evidence that was admitted at trial, the erroneous admission of evidence is likely harmless, *A.B.*, 2018 Tex. App. LEXIS 1790, at *11.

Based on our review of the entire record, we conclude that the affidavits were cumulative of other evidence that was admitted without objection.  Although the affidavits provided more details than the caseworker's testimony about the children's condition when they were removed, the caseworker testified without objection about the circumstances of (i) the children's removal, including that the three oldest children were dirty and "unkempt" when the Department initially became involved with the family; (ii) the failed monitored return, including that "the home returned to the same unsanitary, deplorable conditions"; and (iii) the removal of Child 4 during the pendency of the case, including that Mother left the hospital against medical advice, that Child 4 had "some smoke inhalation," that appellants' vehicle was "full of trash, trash coming out of the vehicle, trash stacked up to the back of the windows of the vehicle, and [Child 4] was in a dirty type car seat," and that there was concern that Mother was living in the vehicle.  The trial court also took judicial notice of its entire file which included the trial court's temporary orders with its findings supporting removal and the Department's reports to the court that detail the Department's investigation and reasons for removal.

Having concluded that the trial court did not abuse its discretion in admitting the affidavits and that even if it did, the admission was harmless, we overrule appellants' first issue.

**Evidentiary Sufficiency Challenges to Termination**

In their second, third, and fourth issues, Mother and Father argue that the evidence was legally and factually insufficient to support the trial court's predicate ground findings under subsections (D), (E), and (O), *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), and its finding that termination of their parental rights was in their children's best interest, *see id.* § 161.001(b)(2).

*Standard of Review*

To terminate parental rights under section 161.001, the Department has the burden to prove one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is the clear and convincing evidence standard. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). The clear and convincing evidence standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence"); *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (explaining that Department's "burden is not simply to prove that a parent should not have custody of her child" but to "meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship

12

with her child whatsoever" (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.))).

Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018); *In re J.F.C.*, 96 S.W.3d at 266. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

In our review of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (explaining that appellate court "should not supplant the [factfinder's] judgment with its own")*; see also In re J.J.O.*, 131 S.W.3d 618, 632 (Tex. App.—Fort Worth 2004, no pet.) (explaining that, in bench trial, trial court judges credibility of witnesses and determines weight to be accorded to testimony).

*Predicate Grounds*

In their second and third issues, Mother and Father challenge the sufficiency of the evidence to support the trial court's findings that a predicate ground existed, but we limit our review to their second issue that challenges the legal and factual sufficiency of the evidence to support the trial court's findings under subsections (D) and (E)—that (i) they knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being, and (ii) they engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis for appeal challenging subsection (D) or (E) findings).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13–14 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).

14

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citation omitted); *see Pruitt*, 2010 Tex. App. LEXIS 10272, at *14. "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262. In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *see In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.").

Because the evidence pertaining to subsections (D) and (E) is interrelated, we may consolidate our review of the evidence. *See V.P.*, 2020 Tex. App. LEXIS 938, *11; *In re M.R.J.M.*, 280 S.W.3d at 503. The Department presented evidence that Mother and Father had endangered their young children by placing them in unsanitary living conditions and knowingly allowing them to remain in those conditions. *See In re K.S.O.B.*, No. 01-18-00860-CV, 2019 Tex. App. LEXIS 2490, at *38 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) ("Allowing children to live in unsanitary conditions endangers their physical and emotional well-being."); *In re G.H.*, No. 02-17-00193-CV, 2017 Tex. App. LEXIS 9845, at *20–21 (Tex. App.—Fort Worth Oct. 19, 2017, no pet.) (mem. op.) (concluding that trial court could have rationally found that parent endangered child's physical or emotional well-being by

providing unsanitary home and failing to ensure that child was personally clean); *D.K. v. Texas Dep't of Family & Protective Servs.*, No. 03-13-00816-CV, 2014 Tex. App. LEXIS 5032, at *11–12 (Tex. App.—Austin May 9, 2014, no pet.) (mem. op.) (observing that allowing child to live in unsanitary conditions that are "persistent rather than isolated" supports endangerment finding).

In this case, the trial court reasonably could have credited the evidence that the three oldest children were at vulnerable ages, all under the age of three, when they were initially removed because of neglect, "deplorable, unsanitary living conditions," and the children's "failure to thrive" and not "meeting their educational growth charts." The children also were dirty and "unkempt." Although at the beginning of the monitored return, the children "were doing well" and the home was in good condition, evidence showed that Mother and Father despite being aware of the Department's stated concerns allowed it to return to the unsanitary living condition that had necessitated the children's initial removal. *See In re M.R.J.M.*, 280 S.W.3d at 502 (explaining that "child is endangered when the environment creates a potential for danger that the parent is aware of but disregards"). Further, after Child 4 was born in April 2020, during the pendency of the case, the evidence showed that Mother left the hospital against medical advice and the stated concern that Child 4 had "some smoke inhalation," and Child 4 was observed in their vehicle that was "full of trash" with Child 4 "in a dirty type car seat." Photographs of the vehicle's interior from October 2020 to January 2021 depict that it continued to be full of trash despite the caseworker's discussions with Mother and Father about her concerns with its conditions and its impact on their progressing to unsupervised visits. *See id.* Although Mother and Father denied that the photographs were of their vehicle, the trial court

reasonably could have disbelieved their testimony. *See In re A.B.*, 437 S.W.3d at 503 (explaining that factfinder is sole arbiter when assessing credibility of witnesses).

Mother and Father complain about the lack of details concerning the Department's removal of the three oldest children in September 2019 and contend that the caseworker's testimony that the three oldest children were not thriving or meeting their educational growth charts were "conclusory statements without any supporting facts" and that there was no "causal link between anything in the children's environment and that diagnosis or 'not meeting their educational charts.'" An endangerment finding, however, does not require evidence of an actual injury or a causal link between an actual injury to a child and the parents' endangering conduct, such as placing the child in an unsanitary living environment. *See Boyd*, 727 S.W.2d at 533; *In re M.A.A.*, No. 01-20-00709-CV, 2021 Tex. App. LEXIS 2315, *48 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (explaining that "children 'need not develop or succumb to a malady due to th[e] [unsanitary] conditions before it can be said that' they were endangered" (quoting *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.))).

Viewing the evidence under the applicable standards of review, we conclude that the evidence was legally and factually sufficient to support the trial court's findings under subsections (D) and (E). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d at 232–33, 237; *In re A.C.*, 560 S.W.3d at 630–31. We overrule appellants' second issue and do not consider their third issue that challenged the legal and factual sufficiency of the evidence to support the trial court's finding under subsection (O). *See In re A.V.*, 113 S.W.3d at 362.

17

*Best Interest Finding*

In their fourth issue, Mother and Father contend that the evidence was legally and factually insufficient to support the trial court's best interest finding. *See* Tex. Fam. Code § 161.001(b)(2).

"The best-interest inquiry is a forward-looking determination that asks whether termination serves the best interest of the child in the future." *In re R.L.*, No. 04-13-00226-CV, 2013 Tex. App. LEXIS 12279, at *17 (Tex. App.—San Antonio Oct. 2, 2013, no pet.) (mem. op.). "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d at 81 (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)).

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best

18

interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, and evidence presented to satisfy the predicate-ground findings may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23.

Mother and Father rely on the evidence that their visits with their children were consistent and appropriate, that they both were employed during the pendency of the case, that they had moved into the trailer that they owned, and that they had acquired a new vehicle; the family service plan that showed that there were no medical or physical concerns with the three oldest children when they were initially removed from Mother and Father's care in April 2019; and their testimony that they were ready and had plans for the children if they were returned. Mother and Father planned to change their working hours to spend more time with the children. They also discount the evidence that the children were doing well in their current placements, arguing that children "are best served by being with their siblings."

In addition to crediting the evidence that supported the trial court's endangerment findings, however, the trial court could have disbelieved Mother and Father's testimony and reasonably found that they would not maintain a safe living environment if their children were returned to them. *See In re A.B.*, 437 S.W.3d at 503; *In re H.R.M.*, 209 S.W.3d at 108. Although the evidence showed that Mother and Father had made progress in addressing the Department's concerns about the condition of their home, they had been unable to provide a safe environment for the children to return until possibly shortly before trial and had not been able to maintain a safe environment for their young children during the 2019 monitored return. *See In re M.R.J.M.*, 280 S.W.3d at 502 (explaining that "factfinder may infer from past conduct endangering the

19

child's well-being that similar conduct will recur if the child is returned to the parent"); *Wischer v. Texas Dep't of Family & Protective Servs.*, No. 03-12-00165-CV, 2012 Tex. App. LEXIS 7523, at *25–26 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.) (same).

Evidence showed that the Department advised Mother and Father of its concerns beginning in April 2019, but the caseworker testified that Mother and Father had been unable to address those concerns during the monitored return and the pendency of the case. Although the caseworker testified that a few days before trial, the trailer's interior "was clean" and "look[ed] livable" with running water and electricity, she testified that she had not seen Mother and Father "consistently over a month being able to live in a clean home" and that she was concerned that they would "end up back in the same conditions, especially based on what the outside of that home looked like." On the last day of trial, she continued to have concerns about the trailer's floors being covered with plywood, a hole in the wall of a bedroom that one of the children would be using, the lack of hot water in the bathroom that the children would be using, and the condition of the yard that was full of trash when she observed it in January and April 2021. Mother and Father's counselor also testified about his belief that they "still need some help and understanding" regarding "being sanitary" and that he did not think that they "fully grasped" "about the need of little children who crawl on the floor, and so forth, to have a clean home."

The caseworker also testified about her observations of Mother and Father's vehicle when they would come for visits at the Department's office and testified that it had remained in the same condition—full of trash—despite her discussions with them. The caseworker testified that Mother and Father initially told her that they were moving things from storage but "the following week the vehicle was in the same condition" and "at that point they started to move the vehicle. They wouldn't park it in the same location." Although Mother and

20

Father had appropriate visits with their children, the Department did not approve unsupervised visits because of the vehicle's "trashed" conditions. When she spoke to Mother and Father about their vehicle's condition, she testified that they denied that it was dirty.

Although Mother and Father denied that the photographs of a vehicle that were taken from October 2020 through January 2021 were of their vehicle and maintained that their home was ready for the children, Mother admitted that there was "still trash outside" the trailer and their vehicle "does get a little dirty." She testified that they were working on their yard and that was why there was a large trash container outside, but the trial court could have found their excuses not credible and credited the caseworker's testimony about the condition of their yard and vehicle during the pendency of the case and the photographs showing the condition of their yard in 2021 and the vehicle over several months. *See In re J.J.O.*, 131 S.W.3d at 632; *see also In re S.B.*, No. 07-19-00146-CV, 2019 Tex. App. LEXIS 9695, at *29 (Tex. App.—Amarillo Nov. 5, 2019, pet. denied) (mem. op.) (observing that "as the trier of fact, the trial court resolved credibility issues and conflicts in the evidence against [parent]"). The trial court also could have credited the caseworker's testimony that the children had "transitioned very well" in their current placements and that the placements were in contact and had assured sibling visits.

Viewing the evidence under the legal sufficiency standard of review, we conclude that the trial court could have formed a firm belief or conviction that terminating parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31; *In re J.F.C.*, 96 S.W.3d at 266. Further, viewing the evidence under the factual sufficiency standard of review, we conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction that termination of parental rights was in the children's best interest. *See In re A.C.*, 560 S.W.3d at 631. Thus, we conclude that the

21

evidence was legally and factually sufficient to support the trial court's best interest findings. We overrule appellants' fourth issue.

**Managing Conservator**

In their fifth issue, Mother and Father challenge the legal and factual sufficiency of the evidence to support the trial court's finding that the appointment of the Department as the children's managing conservator was in the children's best interest.

"In contrast to termination findings, conservatorship determinations are governed by a preponderance-of-the-evidence standard." *In re C.N.S.*, No. 14-14-00301-CV, 2014 Tex. App. LEXIS 8612, at *8 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.) (citing *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)). "The appointment of a conservator is subject to review for abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable." *Id.*

"If the court terminates the parent-child relationship with respect to both parents . . ., the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code § 161.207(a). Based on our review of the evidence supporting the trial court's termination of Mother and Father's parental rights, we conclude that the trial court did not abuse its discretion when it appointed the Department as the children's managing conservator. *See In re C.N.S.*, 2014 Tex. App. LEXIS 8612, at *33 (concluding that trial court did not abuse its discretion in appointing Department as children's managing conservator based on evidence supporting termination of parental rights). We overrule appellants' fifth issue.

**CONCLUSION**

For these reasons, we affirm the trial court's decree of termination.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   October 13, 2021