# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00780-CV

---

### R. C. and H. C., Appellants

### v.

### Texas Department of Family and Protective Services and A. R., Appellees

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
NO. 23-0037-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the trial court signed an order terminating the parental rights of R.C. ("Mother") to her child "Alice" and the parental rights of Mother and H.C. ("Father") to their child "Alison."[1]  In Mother's first four issues and Father's sole issue, they challenge the legal and factual sufficiency of the evidence supporting the trial court's best-interest findings and its findings of statutory grounds for termination.  *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (O) (failing to comply with court-ordered family service plan), (b)(2).  Mother also raises a fifth issue, arguing that the trial court abused its discretion when it did not appoint her as the children's sole managing conservator.  For the following reasons, we affirm the trial court's order.

---

[1]  We refer to appellants by their initials or as Mother and Father, to their children by aliases, and to other individuals by their relationships to the children.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  The parental rights of Alice's father also were terminated in the order of termination, but he has not appealed.

**BACKGROUND**

In March 2023, the Department filed an original petition and sought emergency removal of two-and-one-half-year-old Alice and six-month-old Alison based on allegations that Mother and her boyfriend had been involved in domestic violence and burglarizing vehicles. The trial court signed an order for protection of the children in an emergency and placed the children in foster homes. The trial court also ordered Mother to comply with the Department's family service plan, which included that she maintain safe, clean, and stable housing for her family; demonstrate the ability to provide for the basic needs of her children; make her best efforts to obtain employment; demonstrate the ability to remain drug free; not associate with known criminals or engage in criminal activity; and submit to random drug testing including hair-follicle testing.

In May 2023, the children were moved from their separate foster homes and placed together with A.R. (Foster Mother), who was a close friend of Mother's family, where they remained during the case. Around the time the children were placed with Foster Mother, Mother was in jail where she remained until September 2023. After she was released from jail, Mother participated in the Department's family service plan for her, had supervised visits with the children, obtained appropriate housing, took classes toward her GED, became an apprentice electrician, and stayed in contact with the Department, but she missed multiple requested hair-follicle drug tests, tested positive for marijuana and once for cocaine on drug tests that she did take, and was arrested and in jail for one week in January 2024 for failure to identify.

In August 2023, the trial court ordered genetic testing to determine if Father was the biological father of Alison, and in December 2023, the results of DNA testing confirmed that

he was.[2]  In January 2024, the trial court signed an order establishing the parent-child relationship between Father and Alison and an agreed order extending the dismissal date.  *See* Tex. Fam. Code § 263.401.  The Department also filed an amended petition naming Father as Alison's alleged father, and in February 2024, Father signed the Department's family service plan for him.

Shortly after the DNA testing established that Father was Alison's biological father, Father's parents (Paternal Grandparents) began visiting with the children, sought to have the children placed with them, and sought to adopt or be appointed the managing conservators of the children.  During the case, Paternal Grandparents' home study was approved, and they became licensed foster parents.  In July 2024, they filed a motion in intervention, but Foster Mother opposed their intervention, and the trial court granted her motion and struck their motion in intervention.  In June 2024, Foster Mother, who also was a licensed foster parent, had filed a plea in intervention, which the trial court granted.  In her petition, Foster Mother sought to terminate the parents' rights and to be appointed the children's managing conservator or for the Department to be appointed managing conservator pending her adoption of the children.

The bench trial occurred over four days:  August 12 and 27, September 16, and October 1, 2024.  The witnesses at trial were the children's caseworker, who was involved in the case from July 2024; the Court Appointed Special Advocate (CASA) volunteer, who was involved in the case starting in April 2023; Paternal Grandfather; Paternal Grandmother; Mother; and Foster Mother. Although Father was represented by counsel during the case, he was incarcerated during the case and did not personally appear for trial.  The exhibits included

---

[2]  In October 2023, the results of DNA testing established that the named alleged father in the Department's original petition was not her biological father.

3

Mother's family service and visitation plans; court orders in the case; and excerpts from hearings in March 2023, January 2024, and May 2024.

At the March 2023 hearing, the detective who had investigated Mother in two separate criminal cases testified that there was a physical disturbance between Mother and her boyfriend that resulted in pending charges against Mother of assault causing bodily injury in October 2022, that there was a second incident that resulted in a charge of aggravated assault with a deadly weapon against Mother's boyfriend,[3] and that Mother and her boyfriend fled with the children when law enforcement and Child Protective Services (CPS) were on the way. A deputy also testified that he observed bruising that appeared to be finger marks on one of the children at a hospital in December 2022. The children had been brought to the hospital by a family member when Mother was in jail.

At the hearing in January 2024, Mother testified about her criminal history, including being in jail from June to September 2023 and on January 19, 2024. She testified that there were upcoming hearings on four pending criminal charges against her, but she did not believe that those charges would result in her being in jail for a long period of time.

At the May 2024 hearing, Father testified that he was currently incarcerated for possession of "weed and methamphetamines and crack and Percocets" and possession of an unlawful firearm by a felon and that he was sentenced in September or October of last year to eight years' imprisonment.

---

[3] The detective testified that Mother had informed him that her boyfriend "had threatened her with a knife and had committed an assault against her." She told the detective that her boyfriend "struck her multiple times with a closed fist," kicked her with all his strength, and pulled her hair out, but following the incident, Mother did not cooperate with law enforcement.

4

At trial, the Department did not seek to terminate the parents' rights, but to be appointed the children's managing conservator with the plan to transfer conservatorship to Paternal Grandparents and to have the parents appointed as possessory conservators. The Department representatives believed that Mother had made sufficient progress with her services, and that although Father was incarcerated during the case and did not appear for trial, it was not necessary to terminate his rights if Mother's rights were not terminated. Shortly before trial began, Mother also had given birth to another child. Through the trial's conclusion, Mother was continuing to care for her youngest child, and the Department had not sought to remove that child from her care. And there was evidence that Paternal Grandparents were willing to and would be an appropriate placement for the children. Although the first time she heard about Paternal Grandparents was in July 2024 and she had not observed a visit between the Paternal Grandparents and the children, the CASA volunteer testified that they appeared to be "fantastic" and that she did not have concerns with their ability to protect the children.

Concerning Mother's progress in addressing the Department's concerns, she was not employed, but she had housing and was taking medicine to address concerns with her mental health, she had completed many of the services required in her family service plan, and her visits with the children were appropriate. Mother had completed a psychological evaluation, a psychiatric evaluation, domestic violence and parenting classes, and an OSAR evaluation, and as to her visits with the children, initially they were supervised visits once a week for one hour, but by the time of trial, the supervised visits were twice a week for two hours. The current caseworker testified that the visits were going "[r]eally well" and that the children "are always really, really excited to see her." The caseworker explained that at the beginning of the case,

5

Mother "was aggressive with staff" but that the visits started improving around February or March 2024 and that Mother "started to engage more with the [children]."

Concerning Father's progress, the current caseworker testified that she had not had any contact with him and that she was not sure if the prison where he was incarcerated offered services, but she testified that he signed the family service plan, that she was told that he was eligible for parole, and that her notes through previous caseworkers reflected that he "would like his parents to take the [children]." The CASA volunteer also did not visit with Father during the case.

Foster Mother and the attorney ad litem for the children opposed the Department's plan for the children. They sought, and the CASA volunteer recommended, the termination of the parents' rights so that Foster Mother could adopt them. The CASA volunteer testified that CASA only "started hearing positive feedback about four or five weeks ago" from the caseworker and that when Father was in court, he stated that he did not want anything to do with Alison and only wanted to retain his rights if Paternal Grandparents could adopt. The CASA volunteer also did not believe that managing conservatorship would be good for the children because they were "delicate emotionally" and "need stability" and that it would be "really detrimental to their mental and emotional health" to take them away from Foster Mother.

The CASA volunteer and Foster Mother both testified about Foster Mother's close friendship with Mother's family and described how she had taken care of the children's needs and bonded with them. Foster Mother explained that at the beginning of the case, Mother reached out to her to see if she would take the children because they were in two separate foster homes and that she agreed to do so. After the children were placed in her care, she immediately sought medical care for them. Alice was diagnosed with juvenile arthritis, which can lead to

6

blindness, and began receiving treatment and medication. Alice also only spoke "about eight words," and they included "I hurt" and "doctor"; she "hoarded food" and "initially had a real fear of men"; and she did not sleep through the night and had "nighttime terrors and night sweats." When Alison was placed in Foster Mother's care, she was not speaking and was "very sick" with ear infections and chest congestion. Foster Mother testified that "it's black to white" how the children were doing at the time of trial. Alice is not afraid of men, is "very robust and has full conversations and knows words," feels "really safe," and is "just completely different." And after Alison had surgery, she has only had two ear infections and speaks "all the time and a lot more advanced than her age."

Foster Mother testified that she requested termination so that she would be the sole decision maker for the children and that the alternative of managing conservator would leave them in "a place in limbo." Although she testified that she was committed to keeping a connection between the children and their biological families, Foster Mother expressed concerns for the children's safety if they were placed in the care of Mother or Paternal Grandparents. Foster Mother testified that Paternal Grandmother told her that Mother "was prostituting while dating [her] son" and that when Mother was pregnant with Alison, Father had shown Paternal Grandmother "multiple videos of [Mother] holding a knife to her pregnant belly, saying 'Get back here or I'm going to stab the baby'" and that Foster Mother had discussed the videos with Paternal Grandfather as well. Foster Mother testified that she was concerned about Paternal Grandparents' veracity because they testified that they did not remember or did not have knowledge of the videos.

When Mother testified, her youngest child was six-weeks old and living with her. Mother testified that she learned that she was pregnant with this child when she was around

7

four-and-one-half months pregnant, which was the same with each of her children. Concerning her relationship with Father, Mother testified that she did not have physical altercations with him and that she left him because he was doing drugs. Mother also testified that she had "changed a lot" and was "just a better person inside." She testified that she had "a history of bipolar and depression and anxiety" but had started taking medicine when she was in jail, had been stable with medicine since December 2023 or January 2024, and had housing as of December 2023. Mother also did not believe that if the children were placed with Foster Mother, she would be allowed to see them. Mother asked the trial court to place the children with Paternal Grandparents if they could not live with her and believed that they would meet the children's needs and allow her to have a relationship with the children.

Mother, however, admitted that she had made "bad decisions" when the children were in her care. Mother was unaware of Alice's juvenile arthritis before the children were removed and believed that the children were stronger now. She also admitted that when the children were removed from her care, she "wasn't in a good place" and that she had put the children in "dangerous situations." Her relationship with her ex-boyfriend was "sometimes violent," "unhealthy," and "unstable." Mother also confirmed that she was in jail from June to September 2023 and that she was charged with multiple burglaries of vehicles in January 2023, making false statements in May 2023, assault of a peace officer in June 2023, and assault in July 2023. She testified that the latter assault arose from a physical altercation that she had with a friend when they were in jail. After she was released from jail, she was in a relationship with this friend, and this friend was at the hospital with her when she delivered her youngest child. Mother's charge of assault of a peace officer remained pending, and she was arrested for failure

8

to identify and remained in jail for one week in January 2024 before bonding out. As to her pending charge, Mother believed that she would be sentenced to probation of two years.

Mother also admitted that she missed requested drug testing during the case, including five hair-follicle tests and that the results of the hair-follicle test from August 2024 came back positive for cocaine, but she denied cocaine use and testified that it was a false positive. Within a few weeks, Mother submitted another hair strand for testing that was negative for cocaine but positive for THC. She testified that she had gotten a medical card "yesterday" and was using only Delta-8 gummies.

Paternal Grandparents testified about the relationship between Father and Mother who were together for some months until shortly after Mother learned that she was pregnant with Alison. Paternal Grandfather testified that he and his wife knew that Mother "was pregnant at the time when she was involved in [their] lives, per se, with our son at the time." He described the relationship between Father and Mother as "difficult" with a lot of fighting and arguing, and as to Mother's pregnancy, "sometimes it was our son's child and other times it wasn't." Paternal Grandfather assumed Mother was doing drugs and testified that Father was living the "street life" of "using or selling, you know, drugs"; had made bad choices in his life; that Father and Mother had a negative "track record"; that when Father and Mother were living together, he assumed that Father was selling and using drugs because they were living in a motel and had income without always working; and that they had "bad arguments" when Alice was present.

Paternal Grandmother similarly testified that Mother, Father, and Alice were living together in a hotel for a few months and that they broke up shortly after Paternal Grandmother took Mother to a clinic and Mother found out she was pregnant. Paternal Grandmother testified that Mother told her that the child was Father's but that "they would go

9

back and forth when they would get mad at each other. It was and then it wasn't [his] and then just back and forth, so we didn't know if it was his or not" and that Father did not know "because [Mother] kept saying yes and then no and she was going back and forth." Paternal Grandmother testified that she may have heard that Mother was engaged in prostitution and that Father told her that Mother was acting "crazy" and "out of control." Paternal Grandmother did not believe that Mother and Father could safely take care of the children because they did not have their own lives in order.

In its order of termination, the trial court found by clear and convincing evidence that Mother had knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being, that she had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being, that she had failed to comply with the court-ordered service plan, and that termination of the parent-child relationship was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). The trial court also made the same predicate-ground and best-interest findings against Father as to his parental rights to Alison. Based on its findings, the trial court terminated Father's and Mother's parental rights, appointed the Department and Foster Mother as joint non-parent managing conservators of the children, and granted the Paternal Grandparents the right to possession and access to Alison. *See id.* §§ 161.207 (requiring court to appoint managing conservator of child when court terminates parent-child relationship with respect to both parents), 153.433 (addressing possession of or access of grandchild). These appeals followed.[4]

---

[4] Foster Mother filed an appellee's brief in support of the trial court's order, but the Department did not file one. In a letter to this Court, the Department stated that it did not intend

**Standard of Review**

To terminate parental rights under Section 161.001, the Department has the burden to prove by clear and convincing evidence one of the statutory predicate grounds and that termination is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re R.R.A.*, 687 S.W.3d 269, 271 (Tex. 2024); *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007.

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Legal-sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* at 631. In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could

---

to file a brief defending the trial court's order because it was aligned with the parents at trial in that it did not seek to terminate their parental rights.

not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

We must give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006); *see In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "sole arbiters of the credibility of the witnesses and the weight to give to their testimony" and "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case"); *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that when reviewing termination order, appellate courts defer to "decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

**Endangerment Findings Against Mother**

In her first three issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings of statutory grounds. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). We limit our review to the trial court's endangerment findings against her—that (i) she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being, and (ii) she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one statutory ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal

12

challenging termination under (D) and (E) grounds because of "due process concerns, coupled with the requirement for a meaningful appeal"); *see also In re R.R.A.*, 687 S.W.3d at 279 (reviewing termination under (D) and (E) grounds "because a finding of termination under those grounds may justify termination of parental rights to other children under subsection (M)").

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury," the conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Id.* at *13–14; *see In re C.E.*, 687 S.W.3d at 310 (stating that (D) and (E) grounds "do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[] injury'" (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022))). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 Tex. App. LEXIS 10272, at *14.

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied); *see In re C.E.*, 687 S.W.3d at 310 (stating that subsection (E) "requires that a parent's conduct endanger the child's physical or emotional well-being" but that "[p]roof that a parent specifically caused an injury is not necessary"). "Additionally, termination under

13

subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262.

In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs*., No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *see In re C.E.*, 687 S.W.3d at 310 (stating that "termination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment"). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)." *V.P.*, 2020 Tex. App. LEXIS 938, at *9–10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* at *11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503); *see also In re R.R.A.*, 687 S.W.3d at 280–81.

Mother argues that "no testimony was ever presented about the child's surroundings and environment at the time of removal" and that most of it "centered around [Alice's] surroundings and environment several months before the removal and whether the children should be placed" with Foster Mother or Paternal Grandparents. Mother discounts the evidence when she and Father were living together because it was "long before the time of removal" and argues that it "cannot be sufficient to support termination." *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (stating that "acts done in the distant

14

past, without showing a present or future danger to a child, cannot be sufficient to terminate parental rights" (quoting *In re C.E.K.*, 214 S.W.3d 492, 496 (Tex. App.—Dallas 2006, no pet.))). But there was evidence that Mother, Father, and Alice were living together when Mother was pregnant with Alison. *See Pruitt*, 2010 Tex. App. LEXIS 10272, at *13–14 (stating that courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department"). Thus, the trial court reasonably considered this evidence in making its endangerment findings.

The trial court also could have considered the evidence that at the time the children were removed from Mother's care, she was unable to care or provide for the children's needs and had placed them in dangerous situations. *See In re M.E.-M.N.*, 342 S.W.3d at 262. Mother argues that there was no evidence that the children were present "during any criminal activity that occurred either before the case or at the very beginning" or that she "either engaged in conduct or placed the children with individuals who engaged in conduct that endangered the physical safety or emotional well-being of the children." When she testified, however, Mother admitted that when the children were removed from her care, she "wasn't in a good place," that she had put the children in "dangerous situations," and that her relationship with her ex-boyfriend was "sometimes violent," "unhealthy," and "unstable." *See In re M.R.*, 243 S.W.3d 807, 818–19 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing child to domestic violence supported endangerment findings). And, regardless of whether the children were present when Mother engaged in criminal activity, the trial court could have credited the evidence of Mother's criminal activity both before and after the children's removal in making its endangerment findings. *See In re M.T.R.*, 579 S.W.3d 548, 568 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("A parent's criminal conduct and imprisonment

15

are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child.").

Mother was charged with assault causing bodily injury in October 2022, burglarizing vehicles in January 2023, making false statement in May 2023, assault of a police officer in June 2023, assault arising from a physical alternation when she was in jail during the case, and failure to identify in January 2024. Mother admitted that she was in jail from June to September 2023 and for a week in January 2024 and that charges remained pending against her at the time of trial, including the charge of assault of a police officer. *See id.* (stating that imprisonment alone is not endangering course of conduct but is fact properly considered on endangerment issue and that "[r]outinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical or emotional well-being"); *In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (stating that "abusive and violent criminal conduct by a parent can also produce an environment that endangers a child's well-being").

There also was evidence that Mother used illegal drugs when she was pregnant with Alison and living with Father and Alice and that she continued to use illegal drugs during her latest pregnancy and during the case in violation of her family service plan. *See In re R.R.A.*, 687 S.W.3d at 281 (considering evidence of parent's "continued pattern of drug use" as supporting endangerment finding); *In re C.V.L.*, 591 S.W.3d at 751 ("Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E)."); *see also J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 Tex. App. LEXIS 9308, at *18– 19 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.) (considering drug use during

16

pregnancy and ongoing drug use after child was removed as evidence of endangerment). Mother tested positive for marijuana in December 2023 and January 2024 and cocaine in August 2024, which was shortly after she gave birth to her youngest child. Although Mother testified that the test result was a false positive, the trial court could have resolved this disputed fact against her. *See In re C.E.*, 687 S.W.3d at 314.

Further, even without the evidence of the positive drug test for cocaine, the trial court could have credited the evidence that Mother tested positive for marijuana and missed multiple requested drug tests during the case. *See In re J.W.*, 645 S.W.3d at 734 ("As for the required drug testing, Mother missed twelve of fourteen scheduled drug tests, resulting in those missed tests being deemed positive."); *J.B.*, 2021 Tex. App. LEXIS 9308, at *18 (stating that fact finder could have presumed parent's missed drug tests would have been positive).

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Mother. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule her first and second issues and do not address her third issue challenging the sufficiency of the evidence to support the (O) ground. *See In re N.G.*, 577 S.W.3d at 232–33.

**Endangerment Findings Against Father**

As part of his first issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's predicate findings against him. As we did with our review of

Mother's sufficiency challenges, we limit our review to the endangerment findings against Father.[5]

Father confirms that he was incarcerated during the entirety of the case but argues that Mother had become a safe and appropriate caregiver, that his parents were also safe and appropriate caregivers, and that the Department "did not do the bare minimum to ensure that these children would stay with family, or that [Father] was involved." He complains that the current caseworker and the CASA volunteer did not communicate with him "so he could tell them about his parents." He, however, does not address the evidence that was presented at trial that supports the trial court's endangerment findings against him.

In making its endangerment findings against Father, the trial court could have reasonably inferred from the evidence that Father was aware of Mother's drug use when she was pregnant with Alison and living with him and Alice and that Father was actively participating in creating an endangering environment by selling and using drugs. *See In re J.W.*, 645 S.W.3d at 749–50 & n.13 (observing holdings in which father's knowledge of mother's drug use during pregnancy and corresponding failure to try to protect unborn child from drug use's effects can

---

[5] To the extent that Father is challenging the sufficiency of the evidence to support the trial court's best-interest and predicate-ground findings against Mother, he does not have standing to do so. *See A.P. v. Texas Dep't of Fam. & Protective Servs.*, Nos. 03-18-00780–00781-CV, 2019 Tex. App. LEXIS 2268, at *2–4 (Tex. App.—Austin Mar. 26, 2019, no pet.) (mem. op.) (collecting cases in which court concluded that parent who appealed lacked standing to complain of errors that did not injuriously affect them or that affected rights of others); *D.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-16-00883-CV, 2017 Tex. App. LEXIS 2849, at *1, *8–9 (Tex. App.—Austin Apr. 4, 2017, no pet.) (mem. op.) (concluding that mother did not have standing to challenge termination of father's parental rights); *In re D.C.*, 128 S.W.3d 707, 713 (Tex. App.—Fort Worth 2004, no pet.) (concluding that mother lacked standing to complain about termination of unknown father's parental rights and explaining that party on appeal "may not complain of errors that do not injuriously affect her or that merely affect the rights of others"). In any case, based on our review of the evidence under the applicable standards of review, we conclude that it was sufficient to support the trial court's findings against Mother.

contribute to endangering environment, as can actively participating in creating endangering environment by using drugs with mother, encouraging her drug use, or supplying her with drugs); *In re P.W.*, No. 02-24-00211-CV, 2024 Tex. App. LEXIS 6997, at *24–25 (Tex. App.—Fort Worth Sept. 26, 2024, no pet.) (mem. op.) (upholding endangerment finding against father who knew of mother's drug use during pregnancy and did not attempt to protect unborn child); *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied) (explaining that conduct before child was born and evidence as to how parent treated other children or spouse is relevant regarding whether parent engaged in endangering course of conduct under subsection (E)). Mother testified that she learned that she was pregnant at around four months with each of her children; Grandmother testified that Mother, Father, and Alice were living together for some months before Mother learned that she was pregnant; and Grandfather testified that he believed that Father was selling and using drugs when they were living together.

Father also was convicted of possession of illegal drugs and unlawful possession of a firearm by a felon that resulted in his incarceration and being sentenced in September or October 2023 to eight years' imprisonment. *See In re M.T.R.*, 579 S.W.3d at 568; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (stating that while imprisonment, standing alone, is insufficient to constitute endangering course of conduct, it is factor to be considered on issue of endangerment). And there was evidence that Father knew that Mother was pregnant with his child when they were living together but did not take steps to try to provide support or have contact with Alison, that he did not have a relationship with Alison, and that he represented to the trial court that he did not want anything to do with her. *See In re R.A.G.*, 545 S.W.3d 645, 652 (Tex. App.—El Paso 2017, no pet.) (stating that fact finder may

infer that parent's lack of contact with child and absence from child's life endangered child's emotional well-being).

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Father. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule his issue to the extent that he challenges the endangerment findings and do not address his issue to the extent that he challenges the sufficiency of the evidence to support the (O) ground. *See In re N.G.*, 577 S.W.3d at 232–33.

**Best Interest**

In Mother's fourth issue and as part of Father's first issue, Mother and Father challenge the legal and factual sufficiency of the evidence to support the trial court's best-interest findings. *See* Tex. Fam. Code § 161.001(b)(2).

Relevant factors in assessing the best interest of a child include (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's

20

parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23.

In this case, there was concerning evidence of endangerment by both parents. *See Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23 (explaining that Department need not prove all *Holley* factors, "especially when there is undisputed evidence that the parental relationship endangered the child"). There was undisputed evidence that they both engaged in criminal activities. Father was in prison during the entirety of the case, and his convictions included possession of a firearm by a felon. Mother's criminal history included charges of assaults, both before and after the children were removed from her care, and one of Mother's charged assaults occurred when she was in jail during the pendency of the case. *See In re N.J.H.*, 575 S.W.3d at 832 (explaining that evidence that person has engaged in violent criminal conduct in past permits inference that person will continue violent behavior in future). Mother also had tested positive for illegal drugs.

The trial court also could have credited the evidence that the parents placed the children in danger before they were removed from Mother's care; that the children's needs were not being met before they were taken into care; that the children had improved significantly after being placed with Foster Mother; and that Foster Mother had kept them safe, provided them stability, and was taking care of their needs, including obtaining the diagnosis and treatment for Alice's juvenile arthritis, which can cause blindness. *See In re L.W.*, No. 01-18-01025-CV, 2019 Tex. App. LEXIS 2825, at *69–71 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (considering in best-interest analysis evidence that children were doing well

21

in placement with foster parents, who were meeting children's needs); *see also In re A.K.*, Nos. 07-17-00353–00354-CV, 2018 Tex. App. LEXIS 1324, at *14 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.) (stating that courts may consider improvements by child following removal when assessing child's emotional and physical needs).

Foster Mother, who had taken care of the children since May 2023, testified about her concerns with the children's condition when they first came into care, including that Alice was afraid of men, only spoke a few words which included "doctor" and "I hurt," hoarded food, and had night terrors and sweats. Alison also was not speaking and was "very sick" with ear infections and chest congestion. Foster Mother testified that "it's black to white" how the children were doing at the time of trial. Alice is not afraid of men, is "very robust and has full conversations and knows words," feels "really safe," and is "just completely different." And after Alison had surgery, she has only had two ear infections and speaks "all the time and a lot more advanced than her age."

There was some evidence that it would be in the children's best interest not to terminate the parents' rights. The Department was not seeking to terminate the parents' rights or to remove Mother's youngest child from her care, and representatives of the Department believed she had made sufficient progress in addressing the Department's concerns. There also was evidence that Mother had completed many of the required tasks in her family service plan; the children loved and were bonded with her; that she had obtained appropriate housing, was pursuing her education, had become an electrician apprentice, and was addressing her mental health issues, including taking her medication; and that her visits with her children were appropriate. Mother also testified that during one of her visits, Alice told her that she "wants to stay with [Mother]" and that "[t]hey don't want to go back."

22

Other evidence, however, showed that neither parent was ready to have the children placed with them. *See Holley*, 544 S.W.2d at 371–72 (listing parental abilities as factor to consider). In addition to the evidence of the parents' criminal activity and Mother's illegal drug use, Mother admitted that she was not employed, her visits remained limited and supervised throughout the case, and Father had not had any contact with Alison.

In making its best-interest findings, in addition to Foster Mother's testimony, the trial court also could have credited the testimony of Paternal Grandparents and the CASA volunteer, who was involved in the case shortly after its inception, about their concerns with the parents' ability to care for the children if they were placed in their care. Paternal Grandmother raised concerns about Mother's drug use and Mother and Father not having their lives in order, and Paternal Grandfather raised concerns about the parents' negative track record.

The CASA volunteer testified that CASA believed it was in the children's best interest to terminate the parents' rights and their reasons for this belief, including that Mother had not made "believable progress" in her behavior and that they only "started hearing positive feedback four or five weeks ago" from the current caseworker. The CASA volunteer also expressed concern with the recent positive drug test by Mother and Father's expression when he was in court that he did not want to be involved. The CASA volunteer further testified that she did not believe managing conservatorship would be good for the children because they are "kind of delicate emotionally," that Foster Mother "is the only stability that have known in their life," and that the children "just need stability." *See id.* (listing stability of placement as factor to consider).

Father relies on the "more than enough evidence" to show that appointing Paternal Grandparents as joint managing conservators and the parents as possessory conservators

was in the best interest of the children and that if the children were placed with Foster Mother, there were "no guarantees that the children will know their family." Father argues that the Department's proposed placement with Paternal Grandparents would ensure "close sibling contact as well as a strong familial connection." Shortly after DNA testing established that Father was Alison's biological father, Paternal Grandparents sought to have the children placed with them. They began visiting with the children and were willing to adopt both children or to be appointed the children's joint managing conservators. Their home study was approved, and they became licensed foster parents. And although the CASA volunteer did not visit Paternal Grandparents' home and testified that she did not have enough time or information to evaluate them, she testified that they appeared to be "fantastic" and based on the testimony that she heard during trial, she did not have concerns with their ability to protect the children. Foster Mother, however, was supportive of Paternal Grandparents' staying involved in the children's lives, and the trial court granted them access and possession to Alison, their biological grandchild. Further, although Mother testified that she did not believe that Foster Mother would allow her to have contact with the children if Foster Mother adopted the children, the trial court could have credited the evidence that Foster Mother was a close family friend and her testimony that she sought termination and adoption so that she would have sole decision-making authority but that she was willing to maintain connections with the children's biological families.

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the trial court's best-interest findings against Mother and Father. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31. We overrule Mother's fourth issue and Father's sole issue.

24

**Conservatorship**

In her fifth issue, Mother argues that the trial court abused its discretion by not applying the parental presumption under Section 153.131 and naming the Department as the permanent managing conservator. *See* Tex. Fam. Code § 153.131. She asserts that she should be named the children's sole managing conservator.

Because we have concluded that the evidence was sufficient to support the trial court's termination of Mother's parental rights, Mother does not have standing to challenge the portion of the decree appointing the children's managing conservator. *See In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (explaining that order terminating parent-child relationship divests parent of legal rights and duties with respect to child (citing Tex. Fam. Code § 161.206(b)); *see also A.P. v. Texas Dep't of Fam. & Protective Servs.*, Nos. 03-18-00780–00781-CV, 2019 Tex. App. LEXIS 2268, at *2–4 (Tex. App.—Austin Mar. 26, 2019, no pet.) (mem. op.) (concluding in context of parents' appeal from judgment terminating their parental rights, that parents lacked standing to challenge trial court's striking of grandmother's petition in intervention and collecting cases in which court concluded that parent who appealed lacked standing to complain of errors that did not injuriously affect them or that affected rights of others); *In re H.M.M.*, 230 S.W.3d 204, 204–05 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding appellate court lacked jurisdiction to consider mother's appeal of trial court's failure to grant sole custody to her father after it terminated her parental rights). Further, once an appellate court overrules a parent's challenge to an order terminating the parent's rights, the trial court's appointment of a managing conservator may be considered a "consequence of the termination." *See In re J.D.G.*, 570 S.W.3d at 856 (citation omitted). We overrule Mother's fifth issue.

**CONCLUSION**

For these reasons, we affirm the trial court's order of termination.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:  May 8, 2025